IN THE CASE OF


UNITED STATES, Appellee

v.

Ian J. POMARLEAU, Specialist
U.S. Army, Appellant

No. 01-0588

Crim. App. No. 9800836

United States Court of Appeals for the Armed Forces

Argued February 26, 2002

Decided September 30, 2002

EFFRON, J., delivered the opinion of the Court, in which
GIERKE and BAKER, JJ., and SULLIVAN, S.J., joined.  SULLIVAN,
S.J., filed a concurring opinion.  CRAWFORD, C.J., filed a
dissenting opinion.


Counsel


For Appellant: Captain Runo C. Richardson (argued); Colonel Adele H. Odegard,
    Lieutenant Colonel E. Allen Chandler, Jr., and Major Mary M. McCord (on
    brief); Lieutenant Colonel David A. Mayfield and Captain John N. Maher.


For Appellee:  Captain William J. Nelson (argued); Colonel Steven T. Salata
    and Major Paul T. Cygnarowicz (on brief).



Military Judge:  Richard J. Hough



THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

Judge EFFRON delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of two specifications of drunk driving and two specifications of involuntary manslaughter, in violation of Articles 111 and 119, Uniform Code of Military Justice (UCMJ), 10 USC §§ 911 and 919. He was sentenced to a dishonorable discharge, confinement for seven years, total forfeitures, and reduction to E-1. The convening authority approved the adjudged discharge, confinement, and reduction, and disapproved the adjudged forfeitures. With respect to the mandatory forfeiture of pay and allowances that otherwise would have applied during appellant's confinement, the convening authority granted a waiver from November 4, 1998, until March 4, 1999, directing payment of the funds to appellant's spouse. See Art. 58b, UCMJ, 10 USC § 858b. The convening authority also credited appellant with 54 days of confinement pursuant to United States v. Pierce, 27 MJ 367 (CMA 1989). A divided Army Court of Criminal Appeals affirmed the findings and the sentence in an unpublished opinion.

On appellant's petition, we granted review of the following issue:

> WHETHER THE MILITARY JUDGE ABUSED HIS
> DISCRETION WHEN HE EXCLUDED SEVERAL DEFENSE

> EXHIBITS FROM EVIDENCE WITHOUT FINDING
> EITHER THAT THE DEFENSE FLOUTED DISCOVERY
> RULES TO GAIN A TACTICAL ADVANTAGE OR THAT
> THE GOVERNMENT WOULD BE PREJUDICED BY THE
> IMPOSITION OF OTHER SANCTIONS OR REMEDIES
> SHORT OF EXCLUSION.[1]

For the reasons set forth below, we hold that under the circumstances of this case, the military judge erred by: (1) excluding defense evidence as a discovery sanction for untimely defense disclosure without conducting a factfinding hearing or

---

[1] In view of our disposition of this issue, which was designated as Issue IV in our grant of review, 56 MJ 226 (2001), this opinion does not address the following issues on which review also was granted:

I. WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY DENYING APPELLANT'S CAUSAL CHALLENGES AGAINST PANEL MEMBERS WHOSE RESPONSES TO VOIR DIRE QUESTIONS DEMONSTRATED BIAS WHICH CAST THE FAIRNESS, LEGALITY, AND IMPARTIALITY OF THE PROCEEDINGS INTO SUBSTANTIAL DOUBT.

II. WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE PERMITTED TRIAL COUNSEL TO SHOW THE JURY POSTER-SIZED, GRAPHIC, COLOR PHOTOGRAPHS, ONE DEPICTING THE NAKED, FULL-BODY AUTOPSY PHOTOGRAPH OF A PASSENGER AND THE OTHER DEPICTING THE CONTORTED, BLOODIED CORPSE OF A SECOND PASSENGER, WHICH PHOTOGRAPHS WERE HIGHLY PREJUDICIAL AND WHICH CERTAINLY INFLAMED THE PASSIONS OF THE JURY.

III. WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE ADMITTED SEVERAL POSTER-SIZED, GRAPHIC, COLOR PHOTOGRAPHS, DEPICTING, INTER ALIA, TWO DECEASED PASSENGERS' BATTERED FACES IN APPELLANT'S CASE, WHICH PHOTOGRAPHS WERE HIGHLY PREJUDICIAL AND MARGINALLY RELEVANT AT BEST.

V. WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR WHEN HE FAILED TO SUA SPONTE GIVE UNCHARGED MISCONDUCT AND SPILLOVER INSTRUCTIONS.

VI. WHETHER THE CUMULATIVE EFFECT OF THE MULTIPLE ERRORS HEREIN REQUIRES REVERSAL. See United States v. Dollente, 45 MJ 234 (1996).

otherwise ascertaining the cause for untimely disclosure by the defense; and (2) by not making findings of fact on the record as to whether less restrictive measures could have remedied any prejudice to the Government arising from untimely disclosure.

## I.  Background

### A.  The Collision

The charges in this case stem from a fatal, single-car collision involving appellant and three others in the early morning hours of August 15, 1997, outside Fort Carson, Colorado. The record indicates that after drinking for several hours, appellant left the post in his 1995 Jeep Wrangler, which was equipped with a fiberglass hardtop, and drove to a local civilian club at about 11:30 p.m. on August 14.  At the club, appellant met another soldier, Specialist (SPC) O, with whom he was previously unacquainted.  The two soldiers later left the club in appellant's vehicle, accompanied by two civilians, Ms. D and Ms. N.  The record contains conflicting testimony as to the identity of the driver of the vehicle.

At some point in the journey towards Fort Carson, the driver lost control of the vehicle, struck a guard rail, and crashed.  The Jeep flipped, and all four occupants were ejected. Within minutes of the collision, both women died as a result of their injuries.  SPC O and appellant both sustained serious

4

injuries, but survived. SPC O suffered a broken wrist, significant injuries to his back, and a concussion. Appellant's injuries included cracked ribs and blunt trauma to the head so severe that it left him with no memory of the collision or the events preceding it.

Blood samples were taken from appellant and SPC O shortly after the collision and tested over .10 grams of alcohol per 100 milliliters of blood, the legal limit under Colorado state law. SPC O's blood-alcohol level tested at .117, and appellant's registered at .121.

As noted, there was uncertainty as to who was operating the vehicle at the time of the collision. Appellant had no recollection of the incident, and the eyewitnesses who testified at trial also could not identify the driver. SPC O, who presumably knew who was driving, made a number of conflicting statements to civilian investigators at the crime scene, and later to agents from the Army Criminal Investigation Command ("CID") during interviews conducted eight months after the accident.

SPC O told the first police officer to arrive at the scene that he did not remember who was driving, and then told the officer that he was a passenger in the back seat. When questioned by a second officer at the crime scene, Colorado

State Trooper Maurice Harris, SPC O again stated that he did not know who was driving. When asked if the driver was male or female, SPC O responded, "I can't remember." Based on these responses, Trooper Harris testified that he described SPC O as "uncooperative" in his police report "[b]ecause at the time, . . . when I was talking to him, I find it kind of hard to believe that you don't know who was driving the vehicle that you were riding in."

When interviewed by CID agents in May 1998, a few weeks before trial, SPC O told the agents, "While awake, I've had thoughts that I was the driver of the jeep." He then stated, "I try to put myself behind the jeep, and I can't do it. I see myself as a passenger." SPC O also denied being drunk at the time of the collision during the CID interview.

### B. Pretrial Proceedings

At a hearing under Article 32, UCMJ, 10 USC § 832, Colorado State Trooper David Dolan, the Government's expert in accident reconstruction, testified that he concluded appellant was the driver based on his analysis of the crime scene and estimation of each occupant's expulsion pattern from the vehicle. Other evidence considered by the investigating officer included civilian police reports, photographs and a videotape of the crime scene and the damaged Jeep, the autopsy reports, and other

medical evidence.  Charges were subsequently referred against appellant on March 5, 1998.

The Pomarleau family retained John Smith, an engineer and accident reconstruction expert, and Raymond Smith, an expert in technical accident investigation, to conduct a preliminary review of the Government's evidence to test the validity of Trooper Dolan's claims.  Appellant's family paid $750 for the experts' services.  On or about April 8, 1998, the experts reported their preliminary assessment to defense counsel, concluding that SPC O, and not appellant, was the likely driver of the Jeep at the time of the accident.

The same day, April 8, defense counsel submitted a request to the convening authority to obtain funding to retain the experts for trial, pursuant to RCM 703(d), Manual for Courts-Martial, United States (2000 ed.).[2]  John Smith's testimony was proffered to challenge the scientific validity of Trooper Dolan's expulsion theory.  Raymond Smith's testimony was offered to challenge the competence of the state police's investigation, which Raymond Smith described as "sloppy" and "incomplete" based on the civilian investigators' failure to collect material

---

[2] All Manual provisions cited are identical to the ones in effect at the time of appellant's court-martial.

evidence and inadvertent destruction of other evidence.[3] Raymond Smith concluded that this evidence "may have" provided "conclusive proof" as to the driver's identity.

Defense counsel sought $8,500 for both experts to cover expenses for in-court appearances ($1,000 per day), 23 hours of pretrial preparation at $175 per hour, and $1,500 in fees for the preparation of demonstrative exhibits and additional analysis of the vehicle and accident scene data and related expenses. Defense counsel attached to the request a letter from the experts indicating that they needed the financing approved by April 13 to have sufficient time to prepare for trial, which was then scheduled to begin on April 27.

On April 10, 1998, the convening authority approved the defense's request for John Smith, but at a reduced amount, and denied the request for Raymond Smith. The authorization allowed $3,000 in government-paid assistance if John Smith testified one day, and $4,000 if he were to testify on two days. The staff judge advocate ("SJA") had recommended the reduced amount for John Smith based on his determination that John Smith's

---

[3] The civilian investigators did not fingerprint the steering wheel, the driver's side door, or any other part of the driver's side compartment. The Jeep's interior was not inspected for hair and tissue evidence. Trooper Dolan testified that blood evidence was observed inside the vehicle, but stated samples were not collected. Night photographs taken of the crime scene in the immediate period following the collision were destroyed when Trooper Harris inadvertently exposed the film.

"investigation [wa]s already complete" as of April 7, and financing was only needed for trial preparation and related administrative expenses.

Defense counsel submitted a request to the convening authority on April 14, 1998, seeking an additional $2,165 in funding for John Smith, but did not renew the request for Raymond Smith.[4]  The request included an itemized list of tasks John Smith had yet to complete, as well as the fee for each task.  On April 16, the acting convening authority further allowed $250, but disapproved the balance of the request.  The disapproved funding included fees for John Smith to examine the crime scene and the vehicle with a technical crew, and to analyze the collected data.

The next day, on April 17, 1998, a session was convened under Article 39(a), UCMJ, 10 USC § 839(a), and defense counsel moved to compel the additional funding for John Smith or, in the alternative, abate the proceedings.  See RCM 703(d), supra. During arguments on the motion, defense counsel informed the military judge that the Government's expert, Trooper Dolan, had disclosed new information regarding his theory of the accident the previous day, stating:

---

[4] Although funding was not approved for Raymond Smith, he testified on behalf of the defense at trial.

> [W]hen I talked to Trooper Dolan yesterday,
> for the first time he told me of . . . a
> theory that a bruise on the accused's
> abdomen in his opinion was caused by the
> steering wheel. And, again, injuries to the
> lower legs of who he believes was the front
> passenger in the vehicle, that she had some
> injuries below her knees, he says that's
> consistent with hitting the dashboard.
> Again, this is the type of technical data
> the expert needs to go back to the vehicle
> in order to . . . either verify or refute.

Defense counsel further indicated that the Government had not provided the defense with a videotape of the crime scene until April 7, and that Mr. Smith had visited the scene on April 6 and needed to reexamine the scene in light of the video and the new information the Government's expert had disclosed.

The military judge granted the motion and ordered an additional $1,400 be provided for the defense expert. Trial counsel did not deliver the military judge's order to the convening authority until April 22, at which time the request was approved. During the two weeks the parties litigated the expert funding issue, the military judge continued to address other matters related to the trial, and scheduled the court-martial to begin on April 27. The trial was subsequently delayed until May 26. The record does not indicate when or at whose request the trial date was changed.

### C.  Discovery

On March 11, the Government submitted to the defense a general request for discovery pursuant to RCM 701(b)(3), Manual, supra.  The defense previously had provided the Government with its own request during the Article 32 investigation, which the parties treated as a continuing request after the referral of charges.  The first complaints regarding the pace of discovery appear in the record on April 17, during the Article 39(a) hearing held to consider the defense motion to compel funding for its expert witness.  Trial counsel complained that defense counsel had provided insufficient synopses of the expected testimony of various defense experts, and that he had not yet received the defense's final witness list.  The military judge instructed defense counsel to produce the requested material the same day, and further stated that a hearing would be held if there were any disputes.  There is no indication in the record that such a hearing was ever held or requested by the prosecution.

On May 15, the Government moved to compel discovery, stating that the defense had only "partially complied [with its discovery requests] and provided the government with a list of defense witnesses . . . [but] ha[d] failed to provide the government with copies of charts and diagrams that the defense

11

experts intend[ed] to use at trial." Trial counsel also indicated that he had been unable to interview the defense experts. The record does not indicate what action the military judge took in response to the motion, nor does the record indicate whether the Government further complained about the progress of the defense's discovery compliance prior to trial.

At trial, the prosecution asserted that the defense had not produced for the Government, prior to the commencement of the court-martial proceedings, a number of exhibits and the supporting literature which provided the scientific basis for its expert's testimony. The defense exhibits relevant to the present appeal include: (1) a diagram simulating the motion of an unrestrained passenger in a rollover accident; (2) a computer simulation of the ejection pattern of one of the victims, Ms. D, from the vehicle, and the calculations used to generate it; and (3) the supporting study relied on by the defense expert, John Smith, to prepare both the diagram and the computer simulation, and to which he referred in his testimony.

Trial counsel moved to exclude the exhibits and the study from evidence to sanction the defense for its untimely disclosure. Trial counsel informed the military judge that he had not obtained a copy of the diagram until the second day of trial, and had not received a copy of the study until that day,

12

just prior to the defense's intended direct examination of Mr. Smith.  Trial counsel further stated that he never received a copy of the computer simulation and related materials, and contended he was being "ambush[ed]" by the defense and did not have enough time to review the exhibits and prepare for cross-examination.

In response to the prosecution's objection to the diagram, defense counsel told the court that "[t]he decision to use this as demonstrative evidence was made yesterday after hearing some of the government witness [sic] that will be in rebuttal to some of the government witnesses."  Regarding the computer simulation, defense counsel contended that trial counsel had access to "whatever documents [Mr. Smith] ha[d] as a result of the simulation" and could have asked for them when he interviewed Mr. Smith, but did not.  Trial counsel responded that "[a]t the time the government interviewed Mr. Smith [the day before trial], he said he had not completed all his analysis."

The military judge asked trial counsel how long it would take the Government's experts to review the defense expert's materials, and trial counsel replied, "It could take them an hour; it could take them 2 days."  The military judge then said to defense counsel:

> [Y]ou've really ambushed the government in
> this case.  They're sitting here midway
> through their trial after a presentation of
> 21 or 22 witnesses, with a jury all set to
> listen to the defense side of the case, and
> you've put the court in a position where I
> either grant a delay for them to check stuff
> they should have been able to check before
> trial or I don't let this evidence in, which
> I'm very inclined to do at this point.

The military judge subsequently sustained the prosecution's objection to the diagram and supporting study, excluding the evidence and prohibiting the defense expert from referring to the evidence in his testimony.  The military judge did not indicate the basis for his decision, other than to say, "I do agree with the government."[5]  The military judge later sustained the objection to the computer simulation and related calculations without comment.

A factfinding hearing was not conducted by the military judge, and the record does not indicate that he otherwise inquired into why the defense had not responded to the Government's discovery requests in a timely manner.  However, during litigation concerning prosecution objections to a defense

---

[5] The study the defense expert relied on involved a pickup truck, and the military judge questioned its relevance.  In response, defense counsel argued that the study had a "more general" application.  Trial counsel pressed the military judge to disallow the study to punish the defense for discovery violations.  The military judge stated that he agreed with the Government and sustained the objection without litigating the relevance issue.  The Government has not challenged the relevance of this evidence in the present appeal.

exhibit not at issue in the present appeal, defense counsel

offered the following explanation for his delay in complying

with the Government's discovery requests:

> Mr. Smith has had a hard time preparing for
> trial.  We knew that.  And the reason he had
> a hard time preparing for trial was because,
> first of all, on the front end, the
> government and the defense went through a
> little battle over funding.  By the time
> that battle was over, Mr. Smith had seven
> trials in 3 weeks plus two depositions.  And
> then he started his annual training for his
> reserve duty.  He was supposed to be on AT
> [annual tour] this week.  All of this was
> known to the trial counsel and to the court
> when we scheduled this trial.  Mr. Smith has
> done everything he can to comply with the
> court's order that he be here and testify
> this week. . . .  Your Honor, I've done
> everything I can to comply.

## D.   The Trial

Appellant's trial on the merits took place over a three-day

period, from May 27 through May 29.  Both the defense and

Government cases relied heavily on the testimony of their

respective experts in accident reconstruction to establish the

driver's identity.  A critical fact informing the experts'

opinions was the number of times the vehicle rolled.  This

figure was relied upon to calculate the ejection pattern of each

occupant from the vehicle, which, in turn, formed the basis of

the experts' opinions as to the position of the occupants in the

Jeep prior to the collision.  The eyewitnesses varied in their

15

accounts, testifying that the vehicle may have flipped only once to as many as five times. The experts also reached differing conclusions.

### 1. The Government Case

The government expert, Trooper Dolan, testified that he formulated his ejection theory during his initial inspection of the crime scene a few hours after the collision, stating:

> Trooper Harris and I both went to the scene.
> We got there approximately 6:30. He walked
> me completely through the scene, and I
> looked at the marks in the road. And at
> that point in time, I told him in a rollover
> type situation with a hardtop jeep, since
> the hardtop really didn't come off till the
> last roll, the people stayed relatively in
> the same positions; and the ejection path
> would indicate that the person closest to
> the road, later identified as Mr. [O],
> should be the back seat passenger. The
> person later identified as Miss [D] would be
> the person that was thrown up by the fence.
> The person on the shoulder of the road later
> identified as Miss [D] would be the front-
> seat passenger-- . . . I mean Miss [N]. And
> the person in the roadway would be the
> driver, Mr. Pomarleau.

Trooper Dolan estimated the vehicle was traveling between 76 and 88 miles per hour ("mph") when it collided with the guard rail using the "yaw" method.[6] He further concluded the Jeep rolled

---

[6] Trooper Dolan explained that a vehicle "yaws" when "the rear wheels . . . track[] outside of the front wheels" as it turns. Speed is estimated using the yaw method by measuring the radius of the turn and entering this figure into the yaw equation. Trooper Dolan did not know where appellant's vehicle began to yaw and measured the radius from two tire marks which were

three-and-one-quarter times based on his examination of the damage to the Jeep and marks on the road.

In support of this opinion testimony, the Government introduced crime scene diagrams prepared by Troopers Dolan and Harris tracing the path of the vehicle during the collision, and a yaw chart which graphically illustrated Trooper Dolan's calculations. Medical evidence was also presented to corroborate Trooper Dolan's testimony. The physicians who treated appellant and Ms. N testified that their injuries were consistent with those of a driver and front seat passenger, respectively.

## 2. The Defense Case

The defense challenged Trooper Dolan's ejection theory as scientifically unsound, and claimed his analysis was the product of "inadequate" and "incomplete" investigative work. John Smith, the defense expert, explained his reconstruction analysis as "taking the physical evidence and applying to it the principles of physics, math, and engineering . . . to determine what did happen, what might have happened, and what could not have happened." He testified that a study indicated that "[o]nly 6 percent of all rolls go even one and a quarter rolls.

---

approximately one-half inch apart. This half-inch gap produced the 12-mph difference in his two speed estimates.

So, in real life, vehicles don't roll that far."[7]  He further indicated that cars generally roll once every 1.3 to 1.6 seconds, and that based on the speed Trooper Dolan estimated the vehicle was traveling, it would have flipped at a rate of .2 seconds per roll, which was unlikely.

Mr. Smith also conducted an energy analysis and determined that the amount of rotational energy the Jeep would have generated had it flipped three-and-a-quarter times at 76 mph would have destroyed the vehicle beyond recognition.  He also criticized Trooper Dolan's use of the yaw method to calculate the vehicle's speed, which he claimed had been "discredited" and was based on "assumptions . . . almost never met in real life,"[8] and suggested that the physical evidence did not support Trooper

---

[7] Trial counsel objected to Mr. Smith's reference to this statistical data on the ground that he had not been provided with the research.  The objection was overruled, and the military judge ordered that the "data or literature" be turned over to the Government.  The record is not clear on whether the defense complied with the military judge's order.  During closing, defense counsel argued that "empirical data tells us . . . only 6 percent of vehicles--roll more than one and a half times."  Trial counsel objected, stating, "Sir, objection.  There is no empirical data."  The military judge sustained the objection and gave the following limiting instruction to the panel:

> Members of the court, an expert witness, in giving an opinion, can rely on other data.  However, that data may be considered by you only for testing the basis for the opinion.  It may not be considered by you for the truth of the data.

[8] Trooper Dolan conceded on cross-examination that the yaw method is sensitive to slight adjustments in the radius, and that the 12-mph gap in his speed estimates was due to the half-inch difference between the two tire marks he used to measure the radius.

Dolan's theory, noting "[t]here's no evidence that any part of that vehicle ever touched the pavement three times."

Mr. Smith testified that there was "insufficient data" to allow him to reconstruct the exact movement of the vehicle since all marks along the vehicle path were not documented by the civilian investigators, and that he could only "talk in generalities." He concluded appellant and Ms. N were ejected from the vehicle at similar trajectories, and the amount of energy required to propel them over the distance they were thrown indicated they were in the back seat since "the highest energy was found [sic] to the back seat passengers." He also concluded there was "effectively zero" chance that appellant's rib injuries were caused by the steering wheel, citing federal safety standards which he claimed required that steering wheels bend upon impact and the steering wheel in this case was not damaged.

Mr. Smith theorized that SPC O was in the driver's seat and likely fell out through the driver's side door when it opened during the collision, or went through the roof when the hardtop came off. He could not determine the manner Ms. D was expelled from the vehicle and deduced she went through the window "[b]ased on tests that have been run," referring to the computer simulation and research contained in the supporting study. As

19

previously noted, objections to these exhibits and testimony were sustained, as were objections to defense efforts to admit the diagram simulating the motion of an unrestrained passenger in a rollover.  The only exhibit the defense was permitted to present in support of Mr. Smith's reconstruction analysis was a scaled diagram of the crime scene illustrating technical aspects of his rollover theory.

### 3.  Closing Arguments

As part of the action taken against the defense, the military judge permitted the Government to question the defense experts regarding the late disclosures, to include pretrial conversations trial counsel had with the defense experts.  In closing, the prosecution argued before the members, "How did defense try to prove their case?  By ambush. . . . [T]here's only one reason why Mr. Smith did not provide those documents as he was supposed to.  It's so that the government wouldn't have the opportunity to scrutinize his opinion."  (Emphasis added.)  In his rebuttal argument, trial counsel continued:

> And you got to see here in court how many times I had to object because that was the first time I heard about this stuff. Objection sustained.  Testimony not allowed. Why?  Because he was trying to ambush, he's trying to play fancy-free and footloose with this court-martial.  He's trying to pull the wool over your eyes.  Did you accept his explanation of how it [the Jeep] rolled? Did he tell you how he thought it rolled?

> Did he tell you what the damage was?  No.
> He never gave you a clear answer.

(Emphasis added.)

II. Expert Witnesses, Discovery, and Sanctions for Noncompliance

A.   Employment of Expert Witnesses

"[A]s a matter of military due process, servicemembers are entitled to investigative or other expert assistance when necessary for an adequate defense, without regard to indigency." United States v. Garries, 22 MJ 288, 290 (CMA 1986).  RCM 703(d), supra, allows for the employment of a defense expert at the Government's expense upon a showing that the requested assistance is "relevant and necessary" to the defense case, and "the Government cannot or will not 'provide an adequate substitute.'"  United States v. Ford, 51 MJ 445, 455 (1999) (quoting RCM 703(d)).  The request must be made in writing to the convening authority, and include "a complete statement of reasons why employment of the expert is necessary and the estimated cost of employment."  RCM 703(d).  Should the convening authority deny the request, the defense may petition the military judge to compel the convening authority to authorize the funding, or have the proceedings abated.  Id.

### B. Discovery from the Defense

The foundation for military discovery practice is Article 46, UCMJ, 10 USC § 846, which provides that "[t]he trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." As we observed in United States v. Williams, 50 MJ 436, 439 (1999), "The military justice system has been a leader with respect to open discovery . . . ." See United States v. Enloe, 15 USCMA 256, 258, 35 CMR 228, 230 (1965) (congressional intent to provide a military accused with a broader right of discovery than civilian defendants); Drafters' Analysis of RCM 701, Manual, supra at A21-32. The Analysis notes that broad discovery is "essential to the administration of military justice," adding:

> [B]ecause assembling the military judge,
> counsel, members, accused, and witnesses is
> frequently costly and time-consuming,
> clarification or resolution of matters
> before trial is essential.

Id.

RCM 701 implements the discovery aspects of Article 46.[9] According to the Analysis, "[t]he rule is intended to promote full discovery to the maximum extent possible consistent with

---

[9] In addition to RCM 701, several other rules address specified aspects of discovery. See, e.g., RCM 405; RCM 703; Mil.R.Evid. 506, Manual, supra.

22

legitimate needs for nondisclosure . . . and to eliminate 'gamesmanship' from the discovery process." Id. In addition to addressing the responsibilities of the prosecution, the rule imposes certain duties upon the defense, including the affirmative duty to inform the prosecution of the names and addresses of all witnesses the defense intends to call during its case-in-chief, and the duty to notify the prosecution of certain defenses the accused intends to assert at trial. RCM 701(b)(1) and (2). Moreover, the rule provides that when the defense asks the prosecution to disclose certain specified types of documents, tangible objects, and reports, the defense incurs a reciprocal obligation to provide similar material to the prosecution. RCM 701(b)(3) and (4).

The responsibilities of the defense, as well as the prosecution, also are governed by RCM 701(e), which states:

> Each party shall have adequate opportunity
> to prepare its case and equal opportunity to
> interview witnesses and inspect evidence.
> No party may unreasonably impede the access
> of another party to a witness or evidence.

### C. Discovery - Sanctions for Noncompliance

The defense, as well as the prosecution, must comply with applicable rules and procedures governing the production and presentation of evidence at trial. Williams v. Florida, 399 U.S. 78, 82 (1970) (trial "is not yet a poker game in which

23

players enjoy an absolute right always to conceal their cards until played"). Both civilian and military courts possess the statutory authority to impose sanctions for noncompliance with discovery requirements, ranging from an order permitting discovery to an order prohibiting the offending party from offering evidence not disclosed. See, e.g., Fed.R.Crim.P. 12.1(d), 12.2(d), 16(d)(2); RCM 701(g)(3).

In Taylor v. Illinois, 484 U.S. 400 (1988), the Supreme Court sustained the constitutionality of a rule authorizing exclusion of evidence as a sanction against a defendant for noncompliance. Under the state rule at issue, the defendant was required to provide the prosecution with a list of defense witnesses. After providing a list prior to trial, the defense attempted at trial to call a witness not listed. The trial judge conducted a hearing on the matter outside the presence of the jury. The trial judge concluded that the defense had engaged in a willful violation of the discovery procedures, the trial judge precluded the witness from testifying.

Following his conviction and appeals at the state level, the defendant challenged his conviction before the Supreme Court. He contended a defense witness could never be precluded to sanction a discovery violation because such an action would violate the Compulsory Process Clause of the Sixth Amendment.

24

Conversely, the State argued that the guarantees of the Compulsory Process Clause do not extend to matters beyond application of the subpoena power.

At the outset, the Supreme Court rejected the State's interpretation of the Sixth Amendment, emphasizing that "[t]he right to offer testimony is . . . grounded in the Sixth Amendment." Id. at 409. The Court added: "We cannot accept the State's argument that this constitutional right may never be offended by the imposition of a discovery sanction that entirely excludes the testimony of a material defense witness." Id. The Court also rejected the defense position that under the Sixth Amendment, the preclusion sanction would never be appropriate no matter how serious the defense's discovery violation. Id. at 410. The Court emphasized that "[d]iscovery . . . minimizes the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony," id. at 411-12, and observed that the availability of other remedies, such as continuances, did not mandate an absolute bar against the sanction of exclusion. The Court stated:

> It may well be true that alternative sanctions are adequate and appropriate in most cases, but it is equally clear that they would be less effective than the preclusion sanction and that there are instances in which they would perpetuate rather than limit the prejudice to the State and the harm to the adversary process.

Id. at 413.  The Court added:

> If a pattern of discovery violations is
> explicable only on the assumption that the
> violations were designed to conceal a plan
> to present fabricated testimony, it would be
> entirely appropriate to exclude the tainted
> evidence regardless of whether other
> sanctions would also be merited.

Id. at 414.


    After sustaining the state rule, the Court declined "to

attempt to draft a comprehensive set of standards to guide the

exercise of discretion in every possible case."  Id. at 414.

The Court held that in considering the appropriateness of

exclusion in a particular case, it would be necessary to balance

"the fundamental character of the defendant's right to offer the

testimony of witnesses in his favor" against "countervailing

public interests," which the Court identified as

> [t]he integrity of the adversary process,
> which depends both on the presentation of
> reliable evidence and the rejection of
> unreliable evidence, the interest in the
> fair and efficient administration of
> justice, and the potential prejudice to the
> truth-determining function of the trial
> process[.]

Id. at 414-15 (citing Fendler v. Goldsmith, 728 F.2d 1181, 1188-

90 (9th Cir. 1983)).  Fendler applied a balancing test for

evaluating the disqualification of defense testimony as a

sanction for discovery violations, and included the following

factors: (1) the importance of the witness or evidence to the

defense case; (2) the degree of surprise or prejudice to the

prosecution; (3) the effectiveness of less restrictive remedies;

and (4) the willfulness of the violation.  Id.

In terms of the procedure for considering sanctions for

noncompliance, the Court noted:

> A trial judge may certainly insist on an
> explanation for a party's failure to comply
> with a request to identify his or her
> witnesses in advance of trial.  If that
> explanation reveals that the omission was
> willful and motivated by a desire to obtain
> a tactical advantage that would minimize the
> effectiveness of cross-examination and the
> ability to adduce rebuttal evidence, it
> would be entirely consistent with the
> purposes of the Compulsory Process Clause
> simply to exclude the witnesses' testimony.

Id. at 415 (citation and footnote omitted).  In sustaining the

decision to exclude Taylor's eyewitness, the Court cited

specific facts in the record supporting the trial judge's

determination that the defense's failure to disclose was willful

and blatant.  Id. at 416-17.

Taylor left open the question of whether the Constitution

would permit the exclusion of defense evidence for discovery

violations absent a finding that the violations were willful and

strategically motivated.  See United States v. Johnson, 970 F.2d

907, 911 (D.C. Cir. 1992) (discussing cases); see also 4 Wayne

R. LaFave, et al., Criminal Procedure § 20.6(c) at 946 (2nd ed.

1999) (collecting cases).  Federal civilian courts have split on

27

the question. Some courts require such a finding as a precondition to excluding the contested defense evidence or testimony. See Bowling v. Vose, 3 F.3d 559 (1st Cir. 1993); United States v. Peters, 937 F.2d 1422, 1426 (9th Cir. 1991); Escalera v. Coombe, 852 F.2d 45 (2nd Cir. 1988). Other courts have "not read Taylor as establishing 'bad faith' as an absolute condition for exclusion," and interpret "Taylor as establishing a balancing test in which defense bad faith is a powerful factor" but not necessarily a prerequisite. Johnson, 970 F.2d at 911-12; see also Tyson v. Trigg, 50 F.3d 436, 445 (7th Cir. 1995); but cf. Noble v. Kelly, 246 F.3d 93, 100 n.3 (2nd Cir. 2001) (per curiam) (not deciding whether "a finding of willfulness is required in every case," but requiring that willfulness be shown "where prejudice to the prosecution can be minimized with relative ease").

Regardless of the specific approach, federal appellate courts have generally required that trial courts make findings on the record to support a decision to disqualify defense evidence under Taylor. See, e.g., Johnson, 970 F.2d at 912, 916 (remanding to district court to make findings under Taylor); Noble, 246 F.3d at 101 (where trial "court simply found no 'acceptable' reason for the attorney's failure to provide a notice of alibi," without proper findings, preclusion was

error); cf. United States v. Hamilton, 128 F.3d 996, 1003-05 (6th Cir. 1997) (where trial court's bad-faith finding based on impermissible hearsay, error harmless where de novo review of the record revealed excluded evidence was fabricated).

\*   \*   \*

In the military justice system, RCM 701(g)(3) governs the sanctioning of discovery violations.  The rule, which provides the military judge with a number of options to remedy such violations, states:

> Failure to comply. If at any time during the court-martial it is brought to the attention of the military judge that a party has failed to comply with this rule, the military judge may take one or more of the following actions:
>
>     (A) Order the party to permit discovery;
>
>     (B) Grant a continuance;
>
>     (C) Prohibit the party from introducing evidence, calling a witness, or raising a defense not disclosed; and
>
>     (D) Enter such other order as is just under the circumstances.  This rule shall not limit the right of the accused to testify in the accused's behalf.

Our Court has not addressed the precise question in the present appeal regarding the circumstances under which the exclusionary provision in RCM 701(g)(3)(C) may be imposed against an accused for noncompliance.  Our decisions in this

area principally have dealt with the Government's duty to disclose its evidence pursuant to the relevant constitutional and statutory rules.  See, e.g., United States v. Murphy, 33 MJ 323 (CMA 1991); United States v. Trimper, 28 MJ 460 (CMA 1989).  Prior to the promulgation of the 1984 Manual, there were no formal rules obligating the defense to participate in pretrial discovery.  See David A. Schlueter, Military Criminal Justice: Practice and Procedure, § 10-5 (5th ed. 1996) (noting "[u]ntil recently . . . very little, if any, information about defense evidence or tactics was available to the prosecution").

We have considered the permissibility of barring defense witnesses or evidence to enforce procedural rules in other contexts.  Most recently, in United States v. Roth, 52 MJ 187 (1999), we held that it was error for the military judge to bar a defense witness from testifying during the presentencing hearing to punish the defense for violating a sequestration order.  We first noted that "[o]ur research reveals that the sanction of excluding the witness has been used sparingly, particularly where a government witness has not been sequestered. . . .  Indeed, most of the cases concern the issue that the judge did not exclude the [government] witness."  Id. at 190 (emphasis added) (citations omitted).  We then reversed, holding:

> [T]he ultimate sanction of excluding the witness should be used ordinarily to punish intentional or willful disobedience of the military judge's sequestration orders. [United States v.] Lattimore, [902 F.2d 902, 904 (11th Cir. 1990)]; United States v. Blasco, 702 F.2d 1315, 1327 (11th Cir.), cert. denied, 464 U.S. 914 . . . (1983). As with other rules that may preclude a defendant from introducing important defense evidence, neither the rule nor the enforcement of the rule can be "disproportionate to the purposes they are designed to serve." [] Rock v. Arkansas, 483 U.S. 44, 56. . . (1987); Michigan v. Lucas, 500 U.S. 145, 151. . . (1991).

Id. at 191. We further concluded that such a severe sanction was not warranted where the excluded testimony was material to an important issue and the Government could not show prejudice. Id. In such a case, it would be "fundamentally unfair to leave [the Government's evidence on the matter] totally unrebutted." Id.

Similarly, in United States v. Coffin, 25 MJ 32 (CMA 1987), we reversed where the military judge precluded the defense from challenging the admission of government evidence on the ground that the motion to suppress came after the accused had entered his guilty plea, in violation of Mil.R.Evid. 311(d)(2)(A), Manual, supra, and where the military judge entered his ruling without making any findings on the record. We stated:

> While the rule announced in Mil.R.Evid. 311(d)(2)(A) is salutary and provides for efficient administration of justice, it

> should be liberally construed in favor of
> permitting an accused the right to be heard
> fully in his defense.  See also United
> States v. Williams, 23 MJ 362 (CMA 1987).

25 MJ at 34 (footnote omitted).

\*   \*   \*

The constitutional implications of precluding defense testimony as a sanction for discovery violations in the military justice system are reflected in the non-binding Discussion accompanying RCM 701(g)(3).  The Discussion sets forth detailed guidance respecting "[f]actors to be considered in determining whether to grant an exception to exclusion" when imposed against either party.  These factors include

> the extent of disadvantage that resulted
> from a failure to disclose; the reason for
> the failure to disclose; the extent to which
> later events mitigated the disadvantage
> caused by the failure to disclose; and any
> other relevant factors.

In response to the Supreme Court's decision on Taylor, the Discussion was amended in 1993 to provide specific guidelines for determining whether defense testimony may properly be excluded to enforce the Manual's discovery rules.  See Drafters' Analysis of RCM 701(g)(3)(C), Manual, supra at A21-34.  The Discussion first notes that defense witness testimony should be excluded "only upon finding that the defense counsel's failure to comply with th[e] rule was willful and motivated by a desire

to obtain a tactical advantage or to conceal a plan to present fabricated testimony."  Second, the Discussion states that exclusion is appropriate only "if alternative sanctions could not have minimized the prejudice to the Government."

Third, the Discussion emphasizes that before imposing the sanction of exclusion, "the military judge must weigh the defendant's right to compulsory process against the countervailing public interests[.]"  These interests include: "(1) the integrity of the adversary process; (2) the interest in the fair and efficient administration of military justice; and (3) the potential prejudice to the truth-determining function of the trial process."  See also Taylor, supra at 412.

III.  Application

The military judge at appellant's trial concluded that his counsel had failed to comply with the Government's pretrial discovery requests and, as a result, further determined that appellant should be penalized by precluding the defense from introducing specific expert evidence not disclosed prior to trial.  The granted issue requires us to consider whether the military judge erred by imposing exclusion as the sanction rather than a less restrictive alternative.  See RCM 701(g)(3). We review a military judge's ruling to exclude evidence for an

abuse of discretion.  United States v. Ayala, 43 MJ 296, 298

(1995).  Findings of fact are reviewed for clear error, and

conclusions of law are reviewed de novo.  Id.

*    *    *

The critical question for the members to decide in this

case was who -- appellant or SPC O -- was driving the Jeep at

the time of the accident.  Both the prosecution and the defense

relied on the testimony of accident reconstruction experts to

present their respective cases.  With respect to the testimony

of SPC O as to whether or not he was driving, his credibility

was considerably damaged by his conflicting and equivocal

statements to civilian investigators and CID agents when

questioned immediately after the accident and just prior to

trial.[10]  Under these circumstances, the resolution of this

critical question turned on which expert the members found to be

most reliable.

Because the trial essentially amounted to a battle of the

experts, the defense case was wounded by the exclusion of the

very evidence relied upon by its expert, John Smith, to support

his opinion that SPC O was in the driver's seat.  The military

judge excluded the rollover diagram, computer simulation, and

---

[10] The Court of Criminal Appeals acknowledged that SPC O's credibility was
damaged at trial.  Unpub. op. at 3 n.3.  However, the court concluded "he was
telling the truth[.]"  Id.

related literature based on his conclusion that the defense was attempting to "ambush" the Government by waiting until trial to disclose the materials.

Whether or not the defense intentionally engaged in delay tactics to "ambush" the Government cannot be determined from the record. The military judge did not conduct a factfinding hearing or otherwise attempt to ascertain the cause for the defense's untimely disclosures. While the record is less than clear in this regard, we note that defense counsel's explanation to the military judge for the defense's delay in disclosing the contested exhibits went unrebutted, and the record suggests there may be some validity to his claims.

Defense counsel stated that Mr. Smith testified in seven trials and two depositions in a three-week period before appellant's trial, and this workload impaired his ability to complete the defense exhibits in a timely manner. The prosecution did not dispute the defense position. The record also indicates that as late as April 16, the Government was still in the process of disclosing evidence in its possession to the defense. The Government's expert, Trooper Dolan, did not disclose to the defense critical aspects of his ejection theory until April 16. Additionally, in response to defense supplemental discovery requests dated April 9 and 15, the

Government produced "[n]ewly discovered color copies" of the Jeep, and indicated that additional photographs were still in the process of being developed.

An accused is entitled to expert assistance at the Government's expense in order to have a "meaningful opportunity to present [his or her] evidence . . . [and] challenge[] the Government's scientific proof, its reliability, and its interpretation" when a proper showing of necessity and relevance is made. United States v. Van Horn, 26 MJ 434, 438 (CMA 1988). As both the convening authority and military judge concluded, appellant satisfied this requirement with respect to his expert in accident reconstruction, John Smith. However, because the Government controlled the funding for the experts, appellant's trial preparations were effectively put on hold during the two-week period the funding issue was litigated because the Government resisted the defense request. See RCM 703(d) (requiring requests for expert funding to be made "in advance of employment of the expert").

Whether or not the defense could have prepared and disclosed the contested exhibits in a timely fashion, notwithstanding the funding dispute, is a matter the military judge should have addressed by making findings of fact regarding his decision to impose the preclusion sanction in response to

the allegations of defense discovery violations.  A military judge has the duty to regulate the discovery process to ensure the timely administration of justice, and to protect against surprise and attempts to present unreliable evidence to the members.  Taylor, supra at 412.  This does not, however, permit blind adherence to prudential concerns at the expense of "an accused['s] [] right to be heard fully in his [or her] defense." Coffin, 25 MJ at 34.  The military judge must balance an accused's right to compulsory process against the "countervailing public interests" that the rule is designed to protect and, in the final analysis, ensure that the penalty imposed is not "disproportionate to the purposes [the rule is] . . . designed to serve."  Roth, 52 MJ at 191.

To this end, the Discussion accompanying RCM 701(g)(3) provides useful guidance in conducting the balancing test mandated in Taylor.  Proper consideration by the military judge of the factors identified in the Discussion -- the significance of the contested evidence or testimony to the defense case, prejudice to the Government, efficacy of less severe remedies, and the willfulness of the violation -- before resorting to the most harsh sanction, will ensure that the interests of the accused, as well as "countervailing public interests," are given appropriate weight.  See also Fendler, 728 F.2d at 1188-90.

In the present case, trial counsel conceded that it would have taken at most two days to review the defense evidence in question and prepare for cross-examination. Given the significance of the excluded exhibits and testimony to appellant's case -- the material formed the scientific basis for the defense expert's opinion, which trial counsel repeatedly challenged -- the military judge was obligated to consider whether a less restrictive measure, such as a continuance, could have remedied any prejudice to the Government under these circumstances. Cf. Murphy, 33 MJ at 328-29 (though prosecutor engaged in "unorthodox tactics" and was untimely in disclosing impeaching witness statement, decision to grant a continuance rather than exclude government witness not abuse of discretion). In the absence of findings of facts, we cannot be confident that he did so.

Finally, we note that trial counsel's closing argument compounded the harm to appellant. The argument amounted to an inappropriate comment on the defense expert's credibility, and an invitation to the members to "interpret the military judge's rulings as evidence that Mr. Smith's testimony was a lie." Unpub. op. at 12 (Carter, J., dissenting). First, no evidence was presented to support the allegation that Mr. Smith failed to cooperate with discovery in an attempt to "ambush" the

38

Government or otherwise "pull the wool over [the members] eyes." Second, it is not appropriate in argument to suggest that a military judge's decision to admit or exclude evidence, or to sustain an objection, itself amounts to a comment on the veracity of that evidence or witness, as trial counsel did in this case.

* * * * *

The entry of findings of fact on the record by the military judge is particularly important when the issue involves reasons for untimely disclosure and the availability of alternative sanctions that are less restrictive than exclusion of evidence. In the absence of such findings, it nonetheless may be possible to affirm a conviction if the reasons for the military judge's ruling are otherwise clearly identifiable on the record (e.g., the reasons are discussed during a dialogue between the military judge and counsel), or if exclusion of the evidence at issue did not materially prejudice the substantial rights of the accused. See Art. 59(a), UCMJ, 10 USC § 859(a).

If the reasons provided by the military judge or otherwise apparent from the record are not valid, and exclusion of the evidence is prejudicial under Article 59(a), the conviction must be set aside. If there is uncertainty as to the reasons for the defense violation or as to the availability and impact of

39

sanctions less restrictive than exclusion, it may be appropriate to remand the record for a DuBay[11] hearing.  In the present case, the military judge's failure to make findings of fact as to the basis for the untimely defense response and as to the availability of less restrictive sanctions was compounded by trial counsel's prejudicial argument.  Under these circumstances, it is appropriate to set aside the findings and sentence and authorize a rehearing.

## IV. DECISION

The decision of the United States Army Court of Criminal Appeals is reversed.  The findings of guilty and the sentence are set aside.  The record of trial is returned to the Judge Advocate General of the Army.  A rehearing is authorized.

---

[11] United States v. DuBay, 17 USCMA 147, 37 CMR 411 (1967).

United States v. Pomarleau, No. 01-0588/AR

SULLIVAN, Senior Judge (concurring):

I agree with my learned brother, Judge Effron, and write separately only to emphasize the three points that lead me to concur.

First, the military judge failed to make any findings of fact prior to imposing the most stringent sanction on appellant, the exclusion of key defense evidence supporting the defense theory that appellant was not driving. This was especially unfortunate in this case since such findings would have provided an appellate court with an understanding of the thinking of the trial judge. Without this evidence, the defense was dealt a major blow, without explanation.

Second, it is apparent to me that the sanction went beyond that necessary to insure a fair trial to the Government. As was well stated by Cicero, who many consider the first real trial advocate, "Let the punishment fit the offense."[1] The exclusion of key defense exhibits should be the last, not the first, remedy for discovery violations. Cf. McCarty v. State, 763 P.2d 360 (N.M. 1988). Clearly, there were other remedies that could have been imposed. The Government suggested that it might take two days to evaluate the precluded evidence. Such a delay would have been a small price to pay for justice in this case.[2] Moreover,

---

[1] Marcus Tullius Cicero, Noxiae poena par esto. De Legibus, III, 3. The maxim is often attributed to Sir W.S. Gilbert in the Mikado, act II. Cicero is considered by many to be the father of modern trial advocacy because of his insistence that evidence, not rhetoric, should control the outcome of a trial.

[2] In this regard, I am reminded of the motto engraved in the Attorney General's rotunda of the United States Department of Justice: "The United States wins its case whenever justice is done to one of its citizens in the courts."

United States v. Pomarleau, No. 01-0588/AR

the ruling of the military judge served to gut the defense theory of the case.  In a battle of experts, it deprived appellant of his right to present his case.  As I stated in United States v. Rankins, "[Appellant's] defense to the charge was not a strong one, but it was [appellant's] only one."  34 MJ 326, 336 (CMA 1992)(Sullivan, C.J., dissenting).

Third and finally, the Government was allowed in its closing argument to argue to the military jury that the ruling of the military judge on the discovery motion was tantamount to a conclusion that the defense had attempted to mislead the jury. This alone may have been sufficiently prejudicial to warrant reversal.  See United States v. Achtenberg, 459 F.2d 91 (8th Cir. 1972).

CRAWFORD, Chief Judge (dissenting):

I respectfully dissent because the majority opinion (1) engages in speculation regarding the military judge's ruling, and (2) applies a drastic remedy that is contrary to the prevailing practice in federal, state, and military courts. The gist of the majority's decision is to require the military judge, in factual scenarios such as are present in this case, to set forth all of his or her reasons for sustaining the prosecution's objection to the evidence. The majority overlooks the fact that the judge was able to view these exhibits, as well as consider the lack of foundational proffers by the moving party. The rationale for trial counsel's objections, and for the military judge's ruling -- the lack of disclosure; the lack of logical relevance; the lack of reliability; the fact that the contested exhibits were in support of expert opinion and were created solely for the litigation in this case; and the failure to satisfy the reliability standards of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny -- are evident on the record.

Without question, the defense has a constitutional right to introduce evidence that is both relevant and reliable. See United States v. Leiker, 37 MJ 418 (CMA 1993). As we said in United States v. Hayes, 36 MJ 361 (CMA 1993):

> The Compulsory Process Clause, <u>Chambers v.</u>
> <u>Mississippi</u>, 410 U.S. 284, 93 S.Ct. 1038,
> 35 L.Ed.2d 297 (1973), and the Due Process
> Clause, <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39,
> 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), provide
> criminal defendants the right to introduce
> evidence and the right to examine defense
> witnesses at trial to allow "the jury ... [to]
> decide where the truth lies." See <u>Washington</u>
> <u>v. Texas</u>, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923,
> 18 L.Ed.2d 1019 (1967). The extent of the
> right to present defense evidence is unsettled.
> <u>Cf</u>. <u>Pennsylvania v. Ritchie</u>, 480 U.S. at 56,
> 107 S.Ct. at 1000.

<u>Id</u>. at 362. Evidence that has "any tendency to make the existence of any fact ... more probable or less probable than it would be without the evidence" is logically relevant. Mil.R.Evid. 401, Manual for Courts-Martial, United States (2000 ed.);[1] <u>United States v. Woolheater</u>, 40 MJ 170, 172 (CMA 1994). Moreover, the same evidence must be legally relevant pursuant to Mil.R.Evid. 403. <u>Id</u>. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of ... confusion of the issues ... or by considerations of undue delay...." Mil.R.Evid. 403.

The burden is on the proponent of evidence to show that it is both relevant and reliable by building a foundation for its admission or making an "offer of proof [that] allows the military judge to make an informed ruling and permits the

---

[1] All Manual provisions cited are identical to the ones in effect at the time of appellant's court-martial.

2

appellate courts to review that ruling to determine whether exclusion of the evidence resulted in reversible error." United States v. Means, 24 MJ 160, 162 (CMA 1987); Mil.R.Evid. 103(a), Manual, supra. No offer of proof is necessary when evidentiary relevance is obvious. Scientific or expert testimony is subject to the same evidentiary concerns of relevance and reliability. See Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999); Daubert, supra; see generally United States v. Houser, 36 MJ 392 (CMA), cert. denied, 510 U.S. 864 (1993); Mil.R.Evid. 702, Manual, supra.

The majority finds that the military judge precluded the defense from fully presenting its case during a four-day trial on the merits. The record of trial shows otherwise. Regardless of our differing views of the evidence, the proper course of action -- and indeed the prevailing course of action in federal, state, and military courts -- is to return this record of trial to the Court of Criminal Appeals for factual findings underlying the military judge's exclusion of four defense exhibits so that we can properly assess the military judge's exercise of discretion. See Taylor v. Illinois, 484 U.S. 400 (1988); RCM 701(g), Manual, supra.

FACTS

At issue is whether the military judge abused his discretion in rejecting four defense exhibits that were to be used in conjunction with expert testimony.  See Kumho Tire Co., supra; General Electric Co. v. Joiner, 522 U.S. 136 (1997).

Defense Exhibit TT for Identification (ID) is a one-page item entitled "Figure 6:  Passenger Simulation."  It contains 25 picture frames that appear to demonstrate the motion of an unrestrained passenger inside a vehicle during a rollover accident and how that individual might be ejected from the vehicle.  Defense Exhibit TT for ID was prepared as an overhead viewgraph to be used in conjunction with Defense Exhibit WW for ID during expert testimony.

Defense Exhibit UU for ID is two pages of handwritten notes that are unintelligible without further explanation.  Defense Exhibit VV for ID appears to be a printed graph entitled "EDSMAC Traj. Simulation."  The trial defense counsel made no proffer as to the relevance or reliability of these exhibits.

Defense Exhibit WW for ID is a ten-page document entitled "ATB Model Simulation of a Rollover Accident with Occupant Ejection," authored by Huaining Cheng and Annette L. Rizer, Systems Research Labs, and Louise A. Obergefell, Department of the Air Force.  This study involves a 1988 Toyota pickup truck

and a 1979 Mercury car collision while both vehicles were moving in the same direction on a four-lane state highway. The paper is devoted to simulations of occupants in the Toyota pickup truck. As the majority opinion notes, the fatal accident in the case at hand involved a 1995 Jeep Wrangler with a fiberglass hardtop that was involved in a single car collision with a guardrail.

The military judge's exclusion of the aforementioned defense exhibits for identification must be examined in the context of the case as a whole. When defense counsel attempted to enter Defense Exhibit RR (a scale drawing of the accident scene) into evidence, trial counsel objected to the use of this diagram based on the defense's failure to provide this chart in a timely fashion prior to trial,[2] as well as the lack of reliability of the chart's measurements. After argument, the military judge made the following ruling concerning the motion to exclude Defense Exhibit RR:

> First of all, I believe the basis for the government's objection are [sic] twofold. One is that the chart is based on unreliable information in that it's old; and secondly, in that the defense has failed to comply with their discovery request in a timely manner.

---

[2] Defense counsel faxed a copy of this exhibit to trial counsel at 11:30 p.m. on the night before trial. The fax was sent to the legal assistance office, not trial counsel's home. Trial counsel did not see the exhibit until the following day.

And I agree with both. I agree that this chart is based on information that I don't know if it's adequate, and I don't know if it's reliable, and I don't think the government does either.

Secondly, this court has been set for a fairly lengthy period of time. Now, defense experts, like any other member of the defense team, are required to comply with discovery requests. They are required to comply with the rules of court. And in my view, that has not been done in this case. It's been a sham.

At this time I'm not going to disqualify the chart because I think the chart goes to weight. I am going to give the government any delay they want in this case to send their experts out to compare their measurements with this chart, if they're able to do that, so that they can come back and testify. That's the only fair thing to do in this case. I am also going to let the government counsel cross-examine defense experts on why this chart arrived late and as to why there's a delay in this case if there's a delay that's taken.

Following this ruling, trial counsel immediately complained about another matter of timeliness -- that Defense Exhibit TT for ID had not been previously furnished to the Government. Defense counsel agreed that Defense Exhibit TT for ID was not furnished to government counsel until the third day of trial, May 28. Without further addressing the prosecution's challenge to this exhibit, the military judge returned to the issue of Defense Exhibit RR and the length of time it would take the government experts to review the chart's information in order to determine its accuracy, as well as relevance. Despite the

Government's argument that any delay would prejudice its case,

the military judge rejected trial counsel's argument and said:

> I'll give you a couple-hour delay here and
> see if you can go out there and verify that
> information.  I realize this puts you at a
> disadvantage, and I'm quite appalled at the way
> this discovery was handled.  Quite appalled.
>
> * * *
>
> Again, I understand this soldier has a right to
> representation of counsel, and I'm concerned about
> that.  But I'm also concerned that as a defense team,
> you've got to comply with the rules.  And you've
> really ambushed the government in this case.  They're
> sitting here midway through their trial after a
> presentation of 21 or 22 witnesses, with a jury all
> set to listen to the defense side of the case, and
> you've put the court in a position where I either
> grant a delay for them to check stuff they should have
> been able to check before trial or I don't let this
> evidence in, which I'm very inclined to do at this
> point.
>
> * * *
>
> MJ:  Okay, well, now you understand why I'm
> taking this delay, right?
>
> DC:  Yes, Your Honor.
>
> MJ:  I'm taking this delay because you have not
> complied.  Now, my other alternative is just to not
> allow this document in.  I'm giving you a chance to
> comply so the government can be placed in a position
> of where they can at least cross-examine these
> witnesses and know where these figures came from.
> And, believe me, this is your last chance to do that.

Approximately two hours later, after investigation of the

accident scene by Trooper Dolan (the government expert) and Mr.

Smith (the defense expert), and over trial counsel's objection

that Defense Exhibit RR included marks on the road that no longer existed, the military judge allowed the exhibit to be used.  Trial counsel also renewed his objection to Defense Exhibit RR based on a failure to comply with discovery.  That too was overruled.

The military judge then turned to the admissibility of Defense Exhibits TT and WW for ID -- the chart showing the kinetics of occupant movement in a rollover accident and the literature upon which that chart was based.  The following then occurred:

> MJ:  Well, looking at the abstract in this, it talks about this being a simulation based upon a pickup truck; is that right?

> DC:  Your Honor, I believe the underlying accident that they modeled the study on involved a pickup truck, but I believe the study is more general than that.

> * * *

> TC:  Well, sir, I haven't had a chance to read this thing.  I gave it to Trooper Dolan to read.  But, this, sir, is an exam--you've allowed the defense to use Defense Exhibit RR.  This is just outrageous that right in the middle of a very complicated trial, I get handed something else in mid-court that I have to read and prepare for.  It's outrageous.  If you allow them to use this type of evidence, then they continue to do the same thing over and over again.  There's no incentive to comply with discovery.

> MJ:  I agree.  The government's objection is sustained.  Moreover, looking at the document, I have read it.  I question the relevance to this case anyway based on that.  But I do agree with the government.  I

8

am sustaining the government's objection.  Please move on.  Let's call the members back.

Later in the trial, Mr. John J. Smith, the son of Raymond Smith, testified for the defense.  He was qualified as an expert in the fields of accident reconstruction and bio-mechanics.  Using Defense Exhibit RR, as well as information from law enforcement officers, medical personnel, and witnesses to the accident, Mr. Smith testified that Specialist (SPC) O was driving the vehicle and appellant was in the back seat.  In reaching this conclusion, Mr. Smith opined that the police report showing "the first person being ejected before the vehicle ever started rolling" was in error.  Mr. Smith continued:

> ... next, I looked at the three and a quarter rolls, and I was--I was suspicious because in real life, vehicles don't roll three and a quarter rolls.  In fact, some researchers say that only 6 percent of all rollovers--
>
> TC:  Objection, sir.  This research has not been provided to the government.
>
> MJ:  Do you have that research, [defense counsel]?
>
> DC:  Yes, Your Honor, I believe we do have it available.  I personally do not have it, but I believe Mr. Smith has brought it with him.
>
> MJ:  Why wasn't it presented to the government?
>
> DC:  I was unaware that the government was interested in this research, Your Honor.

> MJ: Well, there was a continuing discovery request, was there not?
>
> DC: Your Honor, [trial counsel] was given the opportunity to interview Mr. Smith, and I was not made aware of any--
>
> MJ: The objection's overruled, but the data or literature will be provided to [trial counsel] this evening.

The witness went on to explain that only six percent of all vehicle rolls go even one-and-a-quarter rolls, and the Government's evidence showing the vehicle rolled three-and-a-quarter times was definitely wrong. Mr. Smith bolstered this testimony by noting that there was no evidence that any part of the destroyed vehicle ever touched the pavement three times.

During direct examination, Mr. Smith forthrightly admitted that while he knew certain things about the accident based on available markings, there was not enough information to know exactly how the vehicle rolled. He concluded that appellant and Ms. N were backseat passengers because they were thrown the farthest and the greatest amount of propulsion energy would come from the back seat. He explained how SPC O, whom he believed to be the driver of the vehicle, was likely thrown from the vehicle. Regarding Ms. D, Mr. Smith candidly admitted that he had "no mechanism to tie her to the right front, but by a process of elimination...." He knew that Ms. D was ejected, but

exactly how, he could not determine.  In particular, when

explaining how Ms. D left the vehicle, Mr. Smith stated:

> Full-scale simulations would indicate she probably
> went through the window.  Based on tests that have
> been run, that's the most likely place for her to go
> out, was the window.  But, again, if the roof had been
> removed at that point--and it probably was--she could
> have gotten out there, also.  She could have also gone
> through the roof.

> TC:  Excuse me, sir.  The government has not been
> aware of any tests that they've run, and we haven't
> seen results of any tests.  And that would also be
> part of our discovery request.

> MJ:  Do you have tests, [defense counsel], results
> of tests?

> DC:  No, Your Honor.  The only test results I'm
> aware of the government provided to me.

> TC: The witness just testified about test results.
> We have a discovery request in, and we have not
> received any test results.

> MJ:  Mr. Smith, do you have test results?  Did
> you conduct tests?

> WITNESS: No, Your Honor.  What I was referring to
> are the full-scale tests that are published in the
> literature.

> MJ:  Okay, now, there's been an objection to
> that, and that's been sustained.

> WITNESS:   Oh, I'm sorry, sir.

> MJ: The members of the court will disregard any
> testimony about literature about expulsion tests.  Do
> you understand that? [affirmative responses from the
> court members]

> MJ:  Thank you.  Please proceed. [further
> questions by the defense counsel:]

Q. Mr. Smith, did you run a computer simulation of this accident?

A. Yes, I did.

Q. Can you please explain to the members of the court what a computer simulation is.

TC: Sir, again, the government has not received any results of a computer simulation or anything.

MJ: Do you have those?

DC: Your Honor, again, Mr. Smith was available. He was interviewed by the government. He had whatever documents he has as a result of the simulation with him at the time of the interview.

TC: I disagree, sir. At the time the government interviewed Mr. Smith, he said he had not completed all his analysis. And that was the day before trial, last Monday.

MJ: Where are those?

WITNESS: Sir, one of the simulations is back there by my father.

MJ: Would you get it, please?

WITNESS: Yes, sir.

MJ: The court's in recess in place.

[The court recessed at 1740 hours and reconvened at 1741 hours, 28 May 1998.]

MJ: The court is called to order. The objection to the simulation is sustained and to the testimony from that simulation.

[further questions by the defense counsel:]

12

Q. Mr. Smith, you testified earlier about calculating the maximum angle of rotation when the vehicle first entered the shoulder of the road.

A. Yes, sir.

Q. Could you--

TC: And, sir, those calculations were not provided to the government either.

MJ: Do you have calculations?

WITNESS: Yes, sir.

MJ: Where are they?

WITNESS: In my notebook, sir.

MJ: Go get them, please. The court's in recess.

[The court recessed at 1743 hours and reconvened at 1744 hours, 28 May 1998.]

[Defense Exhibits UU and VV for ID were marked and shown to the military judge.]

* * *

MJ: ... The objection's sustained. Move on, please.

TC: Sir, does that refer to the testimony, also?

MJ: That's right.

[further questions by the defense counsel:]

Q. Mr. Smith, what is the track width of this vehicle?

TC: Again, sir, objection. The government has not been provided any diagrams that indicate how he measured the track width of the vehicle.

MJ: Overruled.

WITNESS:  Seven point eight feet.


* * *

Q.  In a rollover accident with unrestrained passengers, do the passengers move around within the vehicle?

A.  Absolutely.

Q.  Do they move great distances, or could you please explain--

TC:  Sir, at this time--I believe that exhibit and the basis of study was excluded by the court.  And if this witness is going to testify based upon that study, the government requests that he not be allowed to.

MJ:  I'll allow this question.  Then move on to something else, please.

DC:  Yes, Your Honor.

WITNESS:  [Mr. Smith provided a detailed response.]

At the close of direct examination, trial counsel elected to begin his cross-examination the following day (May 29, 1998). The court opened at 8:11 a.m. on May 29, with more discovery contention:

TC:  Sir, on Tuesday morning when I interviewed Mr. Smith, he tape recorded that conversation.  Last night I asked the defense for a copy of that tape at 6 o'clock.  I stayed until 9:30; I didn't get the copy yet.  My understanding is [defense counsel] came about 9:15, but I didn't receive that tape till this morning before I came into court today.  What I'd like to do is continue on with the cross-examination of Mr. Smith

14

but then at least allow 15, 20 minutes to review that tape at some point.

MJ:  Okay.  Is there anything else to take up at this out-of-court session?

TC:  No, sir.

DC:  Your Honor, if I could just respond to that. I recall the request for the tape being closer to 7 o'clock, and I--

MJ:  Well, let me interrupt you.  I'm not worried about times.  I'm just going to accommodate the government and let them listen to the tape.

DC:  Fine, Your Honor.

MJ:  You don't have any problem with that, do you?

DC:  No, Your Honor.

MJ:  Okay.  And, again, I don't like finger-pointing.  I know you guys are trying to do a good job, and you are doing a good job.  But I just want to make sure that people get equal access.  So, we'll go ahead and conduct your cross-examination.  At some point if you can do without it an hour, if you're--I don't know how long the cross-examination's going to be.  But at some point where we normally take a break, let's take it then.

TC:  Yes, sir.  Thank you.

MJ:  Okay?

DC:  Fine, Your Honor.

MJ:  All right.  Please recall the members.

### DISCUSSION

Our system of justice, like all others, has as its bedrock a single purpose -- "that guilt shall not escape or innocence

15

suffer." Berger v. United States, 295 U.S. 78, 88 (1935); see United States v. Johnston, 41 MJ 13, 16 (CMA 1994)("purpose of a trial is truthfinding within Constitutional, statutory, and ethical considerations"); see also Nix v. Whiteside, 475 U.S. 157 (1986). "To this end, we have placed our confidence in the adversary system, entrusting to it the primary responsibility for developing relevant facts on which a determination of guilt or innocence can be made." United States v. Nobles, 422 U.S. 225, 230 (1975), citing United States v. Nixon, 418 U.S. 683, 709 (1974), and Williams v. Florida, 399 U.S. 78, 82 (1970).

This case is about "adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case." Taylor, 484 U.S. at 411. More succinctly, it is about the right to present "competent, reliable ... exculpatory evidence[.]" Crane v. Kentucky, 476 U.S. 683, 690 (1986). United States v. Scheffer, 523 U.S. 303 (1998), which reversed a decision of this Court, should be heeded. There, the Supreme Court held:

> "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," including the state's "legitimate interest in ensuring that reliable evidence is presented," and evidentiary exclusions will not violate the constitution "so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"

DiBenedetto v. Hall, 272 F.3d 1, 8 (1st Cir. 2001), quoting

Scheffer, supra at 308, and Rock v. Arkansas, 483 U.S. 44, 56

(1987).

In our system of open discovery, "[e]ach party shall have adequate opportunity to prepare its case and equal opportunity to interview witnesses and inspect evidence." RCM 701(e), supra. When one party unreasonably impedes the other party's access to evidence or witnesses, RCM 701(g)(3) empowers the military judge to facilitate discovery, or as a last resort, exclude evidence that was not disclosed. The non-binding Discussion of the aforementioned Rule for Courts-Martial and Taylor, supra, make it clear that the sanction of excluding evidence is not the preferred method of dealing with a failure to comply with a discovery request or the procedural rules relating to discovery.

As the majority opinion notes, ___ MJ at (34), the narrow issue which we must decide is whether the military judge clearly abused his discretion by precluding appellant from introducing or using Defense Exhibits for ID TT through WW. Since these exhibits constituted "scientific, technical, or other specialized knowledge," Mil.R.Evid. 702, supra, the military judge had a gatekeeping obligation to ensure, inter alia, that these exhibits were tied to the particular facts of this case.

17

See Kumho Tire Co., supra.  As the relevance of these exhibits
is not obvious, defense counsel was required to establish their
relevance and reliability to "assist the trier of fact to
understand the evidence or to determine a fact in issue."
Mil.R.Evid. 702.  Since the logical and legal relevance of these
exhibits, as well as the reliability of the data therein, was
not obvious on its face, the gatekeeper, the military judge, did
not err if he sustained the Government's objection to their
admissibility on these grounds.  As the gatekeeper, the military
judge viewed the exhibits, knew by whom they were created and
for what purpose, and properly looked to the proponent to
establish their relevance and reliability.

A careful reading of the opinion of the Court of Criminal
Appeals and the dissent thereto, as well as that of the majority
of this Court, convinces me that this case is being decided on
speculation, and not facts.  The dissent below and the majority
of this Court speculate that (a) the military judge excluded
Defense Exhibits TT through WW for ID because trial defense
counsel purposefully failed to comply with the Government's
discovery request,[3] and (b) defense counsel's failure to turn
over the exhibits at issue in a timely manner was somehow linked

---

[3] I find no comfort in the majority's reliance on a lack of a Government
argument concerning relevance on appeal.  ___ MJ at (14-15)(n.5).  Failure to
argue an issue does not deter this Court from deciding a case based on that
issue.  Cf. United States v. Jordan, No. 01-0483, ___ MJ ___ (2002).

18

to the Government's failure to provide timely and adequate funding for the defense experts. This may well be true, but there is insufficient evidence of record to substantiate such speculation.

I, too, could engage in speculation like the majority. The record of trial convinces me that the exclusion of Defense Exhibits TT and WW for ID was linked to those exhibits' lack of relevance (how is scientific evidence of kinetic motion and ejection from a pickup truck during a two-car accident useful to the members in determining how passengers in a Jeep are ejected in a single car accident with rollover?). The exclusion of Defense Exhibits UU and VV was based on their preparation for litigation and lack of reliability. But such speculation, to include conjecture about why the defense experts were evasive during pretrial interviews and why their exhibits were produced at the 11th hour, would be unfair to appellant. Simply put, there was no finding by the military judge that "the defense counsel's failure to comply with [RCM 701] was willful and motivated by a desire to obtain a tactical advantage or to conceal a plan to present fabricated testimony." RCM 701(g), Discussion.

The sledgehammer approach, which the majority criticizes the military judge for using in this case, but which the

majority is quick to use themselves, is unnecessary.  See United States v. Johnson, 970 F.2d 907, 912, 916 (D.C. Cir. 1992) (remanding the case to the District Court to state the basis for its decision to exclude alibi witnesses and articulate its application of Taylor's balancing test); cf. United States v. King, 222 F.3d 1280, 1283 n.2 (10th Cir. 2000)(where "the record from the district court's proceedings 'is insufficiently developed regarding the suppression issue' to allow this court to resolve an appeal, a remand for further factual findings is the appropriate remedy"); United States v. Hurlich, 293 F.3d 1223 (10th Cir. 2002)(where a district court fails to provide adequate explanation for a particular sentence departure, remand for explanation is required unless an appellate court can unmistakably determine the reasonableness of the district court's particular sentence); United States v. Novaton, 271 F.3d 968, 993 (11th Cir. 2001)(when a record lacks certain trial exhibits, remand is required for district court to make factual findings as to whether any missing exhibits were relevant to defendant's claim).  As there are no on-the-record findings of fact concerning why these exhibits were not turned over to the Government in a timely fashion, the proper and only fair remedy is to return this record to a fact-finding body.

Finally, I disagree with what my colleague states explicitly in his concurring opinion, and what the majority implies -- that the judge's ruling "gut[ted] the defense theory of the case." ___ MJ at (2). In this battle of medical and accident reconstruction experts, both sides had their respective day in court. This is not a case where the defense was denied the right to prove the identity of the perpetrator, nor denied the right to call a witness. See United States v. Valenzuela-Bernal, 458 U.S. 858 (1982); United States v. Roth, 52 MJ 187 (1999). The defense theory of the case, which was fully presented, was that appellant and Ms. N were in the back seat of the vehicle because: (a) they left the vehicle on a similar trajectory; (b) were thrown the greatest distance; and (c) the greatest amount of propulsion comes from the back seat of a vehicle. The members of the court chose not to believe this theory and found that appellant, whose blood alcohol content was .121 some 3-1/2 hours after the accident, was the driver. Absent further findings of fact, it is mere supposition to conclude that the exclusion of Defense Exhibits for ID TT through WW "gutted the defense case."

With regard to trial counsel's closing argument, I find no plain error. See United States v. Baker, No. 01-0464, ___ MJ ___, ___ (2002)(Crawford, C.J., dissenting)(discussing plain

error analysis).  Trial counsel's initial closing argument
covers a mere 15 pages in the record of trial.  In that
argument, trial counsel uses the word "ambush" on one occasion.
There is no reference to the military judge's ruling in
connection with the use of that term, nor any objection by
defense counsel.  Trial counsel suggested Mr. Smith had not
provided him with the documents underlying his testimony because
Mr. Smith was unable to substantiate his views concerning who
was sitting where in the vehicle at the time of the accident.
In particular, trial counsel noted that Ms. Brown, a lay witness
who found SPC O in the grass immediately after the accident at a
location no one disputed, refuted Mr. Smith's findings and
calculations.

During the defense's closing argument, which covers 16
pages in the record, there were three objections by trial
counsel to statements by defense counsel.  Two of these
objections were to defense counsel arguing data or facts not in
evidence and were sustained.

Trial counsel's rebuttal argument, covering 15 pages in the
record of trial, attacked the validity of Mr. John Smith's
conclusions.  Contrary to the opinion of the majority and
concurring judge, as well as the judge in the dissent below,
trial counsel did not invite the court members to equate the

military judge's evidentiary rulings with the notion that the defense was somehow fabricating evidence and misleading the court. In particular, trial counsel argued:

> Who's got the motive at that point to try to create evidence to substantiate their theory? It's them. And how do we know that? It's because you will receive the government's request and motion to compel discovery. This case has been around for awhile. These experts had this case for a long time, and their analysis was not complete--at least, that's what was told the government--until Monday night? Why? Why was it not complete until Monday night? He said he was busy; he was in court. Come on, this is a pretty serious case. He's had it for a long time. It wasn't completed. And you got to see here in court how many times I had to object because that was the first time I heard about this stuff. Objection sustained. Testimony not allowed. Why? Because he was trying to ambush, he's trying to play fancy-free and footloose with this court-martial. He's trying to pull the wool over your eyes. Did you accept his explanation of how it rolled? Did he tell you how he thought it rolled? Did he tell you what the damage was? No. He never gave you a clear answer.

> And he talked about an interview that I had with him previously, and I asked him, "Did you tell me, 'Do you want me to answer the questions you're asking or the questions you should be asking?'" What does that tell you about that man? And what does it tell you about the ability to interview him, to try to get information out of him, and to try to pin him down? It tells you that he's trying to cover something up because he doesn't want to put his opinion on the line. There was no written report. Trooper Dolan had to write a report. They didn't provide any written report to verify what they had to say. All these laws that he spouted out we're just supposed to accept. He says it. "Ah. He's an engineer. He attends these seminars. It's got to be true." Now, there's no question he's an engineer; he's got qualifications I'll never have. But he's got to explain himself to you. And he didn't.

Defense counsel's sole objection during this argument, relating to trial counsel's use of defense counsel's opening statement, was overruled, but the court members were appropriately instructed. In short, trial counsel argued that Mr. Smith never produced any written reports, sat in court throughout the case, waited for Trooper Dolan to testify, and then tailored the defense testimony to ambush the government expert's theory. In short, trial counsel argued that the defense had no answers, no legitimate conclusions, and came up empty-handed. Had the trial counsel argued in such a manner as my colleagues find, that would be error. However, the record speaks for itself, and trial counsel did not evoke the evidentiary rulings of the military judge in any manner that was either improper, unethical, or misleading.

CONCLUSION

I would return the record of trial to the United States Army Court of Criminal Appeals, consistent with Supreme Court rulings and the evidence of record, for further review. Accordingly, I respectfully dissent.