# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39462**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Eric W. MOTE**
Captain (O-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 13 September 2019

————————————

*Military Judge:* Christopher M. Schumann.

*Approved sentence:* Dismissal and a reprimand. Sentence adjudged 2 February 2018 by GCM convened at Hill Air Force Base, Utah.

*For Appellant:* Major Jarett F. Merk, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Captain Peter F. Kellett, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Judge KEY delivered the opinion of the court, in which Senior Judge J. JOHNSON and Judge POSCH joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

KEY, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of five specifications of disrespect towards a superior commissioned officer; one specification of willful disobedience of a superior commissioned officer; and one specification of conduct unbecoming an officer and gentleman, in violation of Articles 89, 90, and 133, Uniform Code of Mili-

tary Justice (UCMJ), 10 U.S.C. §§ 889, 890, and 933.[1] The court-martial sentenced Appellant to a dismissal and a reprimand. The convening authority approved the sentence as adjudged.

On appeal, Appellant alleges the military judge erred by admitting, excluding, and characterizing certain items of evidence; that two specifications are multiplicious; and that an order Appellant received was unlawful. We find no error and affirm the findings and sentence.

## I. BACKGROUND

Appellant had a strained relationship with his leadership, stemming in part from his attempt to establish a "white heritage" month at Hill Air Force Base—the denial of which led to Appellant launching a salvo of complaints. Appellant was admonished for his disrespectful conduct towards senior Air Force leaders and other personnel during the investigation of those complaints, which Appellant responded to by filing additional complaints. During this time, Appellant engaged in further confrontational behavior, to include antagonizing attendees at a base "Diversity Festival" after being denied permission to set up a "white heritage" booth, leading to another round of complaints filed by, and leadership actions taken against, Appellant. All told, Appellant filed nine Inspector General complaints, five Equal Opportunity complaints, and two Article 138, UCMJ,[2] complaints. Appellant, meanwhile, received a letter of admonishment, a letter of reprimand, and nonjudicial punishment under Article 15, UCMJ,[3] for his behavior. Appellant's relationship with his leadership was aggravated by his penchant for using his phone to record interactions with them.

The conduct giving rise to Appellant's court-martial charges began on 6 July 2017 when his second-level supervisor, Colonel (Col) SJ, delivered a scripted, mandatory briefing on the Air Force's then-existing transgender policy to a group of subordinates, including Appellant. Near the end of the briefing, Appellant began asking Col SJ questions in front of the group, including whether Col SJ had a "transracial" policy.[4] At this point, Col SJ told Appel-

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ) and Rules for Courts-Martial are found in the *Manual for Courts-Martial, United States* (2016 ed.).

[2] 10 U.S.C. § 938.

[3] 10 U.S.C. § 815.

[4] Appellant defined "transracial" as someone identifying as belonging to "a different race."

lant they could continue their conversation one-on-one after the rest of the group was dismissed. Col SJ and Appellant, along with Ms. RG—Col SJ's chief of personnel operations—met in Col SJ's office. Once in Col SJ's office, Appellant reengaged with his "transracial" line of questioning, asking among other things whether he would be eligible for "one of the black awards," despite being white. Appellant then transitioned to questioning how Col SJ would respond if the Secretary of the Air Force issued a policy supporting child pornography—that is, whether Col SJ would adopt a similar policy for his directorate. When Col SJ explained that child pornography was against the law, Appellant replied, "[t]here's all kinds of things you can be tolerant toward. Let's be tolerant toward child pornography . . . different strokes for different folks." Col SJ described Appellant as being argumentative, interrupting Col SJ, not letting Col SJ answer his questions, slouching in his chair, and smirking during the conversation. Ms. RG described Appellant as slouching, smirking, "snarky," demeaning, and asking questions in "kind of a smart-alecky tone." Ultimately, Col SJ told Appellant, "if you're done, you can now leave."

When Appellant gathered his belongings together to leave the office, Col SJ noticed Appellant had his phone on top of some books. Col SJ—aware that Appellant had recorded other conversations in the past—asked Appellant if he was recording the conversation. Appellant answered in the affirmative. Col SJ then told Appellant, "I need your phone," but Appellant refused to give his phone to Col SJ, asking Col SJ what his authority was to take the phone. Appellant touched the screen on his phone, and Col SJ asked Appellant if he was still recording. Appellant, however, would not answer. Col SJ told Appellant to remain in the office while Col SJ stepped out to call the staff judge advocate (SJA). After discussing the situation with the SJA, the SJA advised Col SJ to not attempt to seize the phone due to uncertainty about the state of the law regarding recording of conversations without the consent of both parties. Col SJ returned to his office and told Appellant he could leave. Appellant asked Col SJ if he was going to take his phone. When Col SJ said he was not going to take it, Appellant challenged Col SJ: "So the lawful order you just gave me was in fact unlawful, was it not? It was an abuse of authority, was it not?" Col SJ declined to answer Appellant's questions and then asked Appellant if he was still recording. Appellant turned and walked out of Col SJ's office.

For his conduct during this meeting, Appellant was charged with disrespect toward a superior commissioned officer.[5]

Just under a month later, Appellant sent a disrespectful email to the Air Force Sustainment Center commander's executive officer about the commander's progress on one of Appellant's complaints.[6] On 9 August 2017, Col SJ had his executive officer, Major (Maj) CW, set up a meeting with Col SJ, Appellant, and Appellant's supervisor, Lieutenant Colonel (Lt Col) DW, for the purpose of giving Appellant a letter of reprimand for the disrespectful email. In an attempt to prevent another argument about Appellant recording conversations, Col SJ asked Maj CW to have the meeting participants leave their phones on Maj CW's desk before entering Col SJ's office. Maj CW conveyed this direction to Lt Col DW and Appellant. Lt Col DW put his phone on Maj CW's desk, but Appellant just stood there, neither setting down his phone nor saying anything. Maj CW again asked Appellant to leave his phone and Appellant again said nothing. Col SJ came out of his office and told Appellant to leave his phone with Maj CW, but Appellant would not comply. Col SJ then directed that the meeting would be moved to "the vault," a secure room next to his office where mobile devices are prohibited. Appellant refused to enter the vault, saying that if they were not going to be discussing anything classified, there was no reason to have the meeting in the vault. Col SJ told Appellant to enter the vault, and Appellant again refused to comply with this direction, saying he needed his phone as his "witness." After further argument, Col SJ decided to move the meeting back to his office, and he once more told Appellant to leave his phone outside the office, to which Appellant replied, "[w]e can go into the courtyard if you want to have it."

Abandoning his efforts to have Appellant leave his phone with the executive officer, Col SJ had Lt Col DW and Appellant enter Col SJ's office where Col SJ proceeded to read the letter of reprimand to Appellant. Appellant challenged Col SJ on various points of the reprimand during the meeting, and Col SJ testified Appellant was "very combatant, very rude, discourteous," and at one point Appellant said Col SJ "didn't deserve the respect of an officer." At the conclusion of the meeting, Col SJ told Appellant he could leave, but Appellant refused to do so unless he received an order from Col SJ to leave the office, which Col SJ ultimately issued.

---

[5] Specification 1 of Charge I.

[6] In the email, Appellant—among other things—asked the executive officer, "Was this a formal investigation with documented findings? Or was it more like the general just shrugged his shoulders and tossed my complaint in the trash?"

As a result of his conduct during the 9 August 2017 meeting, Appellant was charged with being disrespectful towards Col SJ and for willfully disobeying Col SJ's order to leave his phone outside the office.[7]

The following day, Col SJ issued a unit-wide policy prohibiting the recording of workplace conversations without first obtaining the consent of all participants. In response, Appellant sent an email on 14 August 2017 titled "illegal 'recording policy'" to Major General (Maj Gen) SJ, the commander of the of the Air Force Nuclear Weapons Center; the center's SJA; and a member of the center's Inspector General's office. Appellant courtesy copied his directorate on the email, which consisted of approximately 650 other people, to include military, civilian, and contractor personnel. Col SJ was one of those in the courtesy-copy line of the email. At the top and bottom of the email, Appellant wrote, "NOTE: This is a protected communication under the Military Whistleblower Protection Act and contains allegations of multiple instances of misconduct by [Col SJ]." In the email, Appellant aggressively and sarcastically attacked both Col SJ's recording policy and Col SJ himself.[8]

For sending this email, Appellant was charged with being disrespectful towards Col SJ and for conduct unbecoming an officer.[9] Two days later, Col SJ told Appellant his security clearance was being suspended, and Appellant's conduct during that conversation was the basis for Appellant's fourth specification of being disrespectful toward a superior commissioned officer.[10]

Five days after his security clearance was suspended, Appellant filed an Article 138, UCMJ, complaint against Maj Gen SJ, essentially alleging Maj Gen SJ had failed to take action against Col SJ. With a mix of sarcasm and pretension, Appellant's complaint demanded Maj Gen SJ, *inter alia*, resign

---

[7] Specification 2 of Charge I and the Specification of Charge II.

[8] For example, Appellant wrote in the email that Col SJ "published the recording policy in question, under false pretense of military necessity, as a means of concealing his incompetence and evading accountability for any future misconduct he may to wish to perpetrate against [Appellant];" that Col SJ "begged [Appellant] to leave his office;" that Col SJ's "willingness to degrade the morale of this entire unit by restricting people's routine use of their cell phones, simply because he is angry at [Appellant] is ridiculous;" and that Col SJ's "policy is groundless, misrepresentative, unnecessary, abusive, wasteful, disingenuous, serves no military purpose, and is intended to conceal violations of law and regulation [and] . . . should therefore be countermanded."

[9] Specification 3 of Charge I and the Specification of Charge III.

[10] The Specification of the Additional Charge.

his commission and authorize Appellant to disobey Col SJ's orders. For the tone of this complaint, Appellant was charged with a fifth specification of disrespecting a superior commissioned officer.[11]

Appellant raises the following issues on appeal: (1) the military judge erred by not allowing Appellant to impeach Col SJ with his recording of the 6 July 2017 meeting; (2) the military judge erred by telling the members the same recording had not been verified or authenticated by the Government; (3) the military judge erred by admitting evidence of Appellant's nonjudicial punishment and letters of admonishment and reprimand for uncharged offenses; (4) Specification 3 of Charge I is multiplicious with the Specification of Charge III, as they both arise from Appellant sending his 14 August 2017 "illegal 'recording policy'" email; and (5) the military judge erred by ruling Col SJ's order for Appellant to leave his phone outside his office was lawful.[12]

## II. DISCUSSION

### A. Appellant's Phone Recording and its Use at Trial

Because Appellant's first two assignments of error both pertain to the admission of Appellant's recording of the 6 July 2017 meeting, we consider them together.

#### 1. Additional Background

At trial, Col SJ testified that during the meeting, Appellant became argumentative, interrupted Col SJ, and would not let Col SJ answer Appellant's questions. Col SJ characterized Appellant's demeanor at the end of the meeting (when Appellant accused Col SJ of giving him an illegal order) as being "very animated," "going off," "yelling," "screaming," and being "very combatant," "very rude," and "discourteous." In recounting the meeting, Col SJ testified he responded to Appellant's question about being eligible for "one of the black awards" with:

> I said that all these awards had specific [Air Force Instructions] that surrounded them, and if he met the criteria and if his performance met certain levels of performance, that I would consider him and put him in for it and that was it. But I said, "this is a little strange." But we had that conversation.

---

[11] Specification 4 of Charge I.

[12] Appellant personally raises the fifth issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

After trial counsel's direct examination of Col SJ, trial defense counsel requested an Article 39(a), UCMJ, session in which trial defense counsel disclosed for the first time their possession of a recording of the 6 July 2017 meeting. Trial defense counsel conceded they did not turn over the recording in the face of a Government discovery request, justifying their tactic by arguing the recording contained "potentially inculpatory statements that, you know, the defense is making a balancing test whether or not to use and put these on at the point at which they became relevant."

Trial defense counsel sought permission to use the recording for impeachment purposes during Col SJ's cross-examination, and then "authenticate it through the defense's case in chief."[13] Trial defense counsel offered shifting theories for using the recording. Initially, trial defense counsel cited Mil. R. Evid. 613 for the proposition that the recording could be used to show inconsistencies in Col SJ's testimony on direct. Trial defense counsel then posited the recording could be used for impeachment by contradiction and prior inconsistent statement and to show bias under Mil. R. Evid. 608(c). To support their argument, trial defense counsel recounted portions of Col SJ's testimony—not all of which is supported by the record. Trial defense counsel argued that: (1) Col SJ testified he told Appellant "this is a little strange," but that the recording included no such language; (2) Col SJ testified Appellant was argumentative, but the recording did not support that characterization; (3) Col SJ testified that he could tell Appellant was upset with the transgender policy, but the recording would not so indicate; (4) Col SJ testified Appellant accused him of endorsing child pornography,[14] but that was not on the recording; (5) Col SJ testified Appellant "equivocated" when first

---

[13] Trial defense counsel said they wanted to "use [the recording] in the cross," but did not comment on whether they intended to use the entire recording or just portions of it.

[14] Trial defense counsel's characterization of Col SJ's testimony on this point is misleading. Col SJ testified that Appellant asked "if the Secretary of the Air Force had a policy on child pornography and thought that was an allowable situation, would I then create a policy to allow child pornography within the directorate[?] . . . My response is policies do change. Child pornography was against the law and that I wouldn't have a policy that would be out there that would be a violation of the law." Trial counsel asked, "When you said that 'I would have to follow the Air Force policy,' did [Appellant] accuse you of supporting child pornography at that point?" Col SJ responded: "He indicated that would be supporting child pornography." On cross-examination, trial defense counsel asked, "Your testimony this morning was that he accused you of supporting child pornography?" Col SJ replied: "I don't think that's how the conversation went. I don't think that's how the conversation was at all."

asked if he was recording,[15] but the recording would not reflect that; (6) Col SJ testified he made "simply a request" for Appellant to remain in the room while Col SJ sought advice,[16] but the recording would show "it was a very specific and loud command;" (7) Col SJ testified that at the end of the conversation Appellant "got animated" and was "screaming" and "going off," but the recording would not demonstrate that; (8) Col SJ testified he tried to explain that an order to turn off Appellant's phone was not illegal, but the recording would not show that; and (9) Col SJ testified Appellant did not call him "sir,"[17] but Appellant actually said "sir" four times.

The military judge and counsel then listened to the recording of the meeting, a non-verbatim transcript of which is attached to the record of trial as Appellate Exhibit LXII. After listening to the recording, trial defense counsel said the recording was being offered under Mil. R. Evid. 608(c), 611(b),[18] and 613(b). The military judge initially told trial defense counsel they would not be permitted "to play that recording from start to finish," but that "possibly, if on cross-examination, [Col SJ] answers these particular questions that you've raised inconsistent with what you believe is in the audio, then maybe you get snippets of the audio to demonstrate the inconsistency."

After taking a recess, the military judge ruled the Defense would be allowed "to play the recording in its entirety for the limited purpose of its tendency, if any, to contradict [Col SJ's] testimony, for example, regarding whether [Appellant] was, in fact, yelling, interrupting [Col SJ], was argumentative, or was combative, or any other relevant impeachment purpose under Mil. R. Evid. 608(c)." The military judge said he would instruct the members that they could only consider the recording for the limited purpose of showing Col SJ's bias or prejudice. The military judge also advised that "counsel are certainly free to argue or articulate to the members any perceived issues or

---

[15] Trial defense counsel's characterization is incorrect—Col SJ testified on direct that he asked Appellant if he was recording the conversation and Appellant replied, "[y]es."

[16] Col SJ did not testify on direct that he either asked or ordered Appellant to stay in the room.

[17] Col SJ had testified about Appellant not calling him "sir" during the 16 August 2017 meeting, not the 6 July 2017 meeting. Trial defense counsel argued Col SJ's testimony about the 16 August 2017 meeting meant Appellant had never before called Col SJ "sir," to include during the 6 July 2017.

[18] Mil. R. Evid. 611(b) pertains to the scope of cross-examination. The rule does not advance Appellant's argument.

shortcomings with regard to the quality or content of the audio recording, including its source." After the military judge proposed a limiting instruction, trial defense counsel asked the military judge to

> . . . augment that instruction with also the 613(b), not just for bias, but also you make something along the lines of, "[m]embers, you may consider this for the purposes of extrinsic evidence of a prior inconsistent statement" and then kind of the normal balancing language, "To the extent you believe this is inconsistent with [Col SJ's] testimony on the stand is, you know, something for you to decide," and then all the other kind of warning [sic], consider the source and where it came from when making that determination.

From there, trial defense counsel went on to argue the recording was not hearsay under Mil. R. Evid. 801(d)(1)(A) but was a prior inconsistent statement. Trial counsel pointed out that rule was inapplicable due to the fact the statements in the recording had not been given under penalty of perjury. Trial defense counsel then asserted the Defense was not offering the recording for the truth of the matter asserted, but to impeach Col SJ "and expose the prior inconsistent statement," arguing the recording was admissible to show bias under Mil. R. Evid. 608(c) and as extrinsic evidence of a prior inconsistent statement under Mil. R. Evid. 613(b).

During this discussion about the admissibility of the recording, trial defense counsel interjected, "[s]o just to preview the way ahead, we're going to talk about [Col SJ's] testimony today, going to give him the opportunity to—confront him with what I think it will show, give him the opportunity to explain or deny, and then hit 'play.'"

In the end, the military judge reiterated the recording could not be used as extrinsic evidence of a prior inconsistent statement because it was hearsay, but that it could be used to show Col SJ's bias, prejudice, or motive to misrepresent under Mil. R. Evid. 608(c).

In response to this ruling, trial counsel argued the Government had not had the opportunity to analyze the recording, leading the military judge to propose adding this line to his instruction: "The content of the recording has not been authenticated by the Government." When asked if there were any objections to that instruction, trial defense counsel said, "Our objection is simply that it does not include the 613 language that we requested. Otherwise, no objection, Your Honor. But we've previously stated our reasons."

Col SJ was called back to the stand, and trial defense counsel commenced his cross-examination, including this exchange:

> Q. . . . And at that point you said, "This is a little strange."

A. In my mind, yes, I was thinking this was really strange.

Q. Got it. So your testimony now is it was in your mind; you did not verbalize it?

A. I—again, I'm not going to recall specifically that moment in time. In my mind is what I was thinking this was strange. I did say, "These are off-topic questions." I says [sic] "I have no idea what transracial means."

Q. And, sir, my question wasn't asking you to—it was just asking to recall your testimony from this morning, and I believe your testimony this morning was you said at this point, "This is strange."

A. I—

Q. Did you say that?

A. Again, it—we are talking about multiple conversations, and I'm sorry that I keep bringing this up. Yes, I probably just said that what you just said.

Trial defense counsel later asked Col SJ whether Appellant called him "sir" at least four times during the 6 July 2017 meeting—Col SJ answered, "no." Trial defense counsel then asked, "He didn't yell; it was actually you that yelled, right?" Col SJ answered, "No. I disagree with that also." At that point, trial defense counsel said he was ready to play the recording, and the military judge gave the members the following instruction:

> You are about to hear an audio recording of the conversation between the accused and [Col SJ] on 6 July 2017. This conversation was recorded by the accused. The content of the recording has not been authenticated by the Government. You can consider this audio recording for the limited purpose of its tendency, if any, to show bias, prejudice, or any motive to misrepresent on the part of [Col SJ] as it specifically relates to his testimony describing that meeting on 6 July 2017. You may not consider this audio recording for any other purpose.

Trial defense counsel proceeded to play the recording in its entirety for the members. Appellant did not offer the recording itself into evidence at any point during the trial.

After the Defense rested, the military judge held an Article 39(a) hearing to discuss findings instructions. Regarding the recording, trial defense counsel argued Col SJ had "adopted" the recording, and therefore the Defense "should get the prior inconsistent testimony language and be able to ar-

gue . . . prior inconsistent [statement]. Nothing further on that one." The military judge explained the recording was played for the members "for the sole purpose of impeaching [Col SJ]. It wasn't offered for the truth contained within it. It wasn't offered . . . as substantive evidence. It was simply used as impeachment evidence." The military judge continued, "It was only admitted for the limited purpose of its tendency, if any, to show bias, prejudice, or motive to misrepresent on the part of [Col SJ], and that's the limitation on that particular evidence." During his instructions on findings, the military judge repeated the instruction about the audio recording he had given the members when the recording was played with a slight modification: he instructed that the recording had "not been verified or authenticated by the Government," where he had earlier only stated it had "not been authenticated." Appellant did not object to this change.

On appeal, Appellant argues a proper foundation was laid for the recording to be admitted as "extrinsic evidence of a prior inconsistent statement for impeachment purposes," and that the military judge abused his discretion "when he ruled that only statements that were made under oath could be used as extrinsic evidence for impeachment purposes." Appellant argues "the military judge should have allowed defense counsel to . . . play the portion of the audio that impeached the specific area of Col SJ's testimony," instead of "forcing defense counsel to play the entire audio" and then giving "an inaccurate and confusing instruction to the members." Appellant further avers trial defense counsel "did not seek to admit the audio recording as substantive evidence," but to "demonstrate that [Col SJ's] memory of the events was inaccurate." Appellant argues his counsel was thereby deprived of the ability to argue to the members that Col SJ's memory of the meeting was inaccurate, because the recording could not be used as "impeachment evidence." This ostensibly deprived Appellant of the ability to attack Col SJ's "perception and recollection of Appellant's statements and demeanor" during the meeting and subsequent meetings.

Beyond the admission of the recording, Appellant argues the military judge erred when he instructed the members that the Government had not verified or authenticated the recording, thereby suggesting to the members the recording should be given less weight than other evidence.

In short, the theory Appellant now advances is that trial defense counsel should have been allowed to play only selected portions of the recording during Col SJ's cross-examination; statements contained in those portions of the recording should have been admitted as extrinsic evidence of prior inconsistent statements, but not as substantive evidence; and the military judge should not have advised the members that the recording had not been verified or authenticated by the Government.

11

**2. Law**

When an appellant fails to object at trial to the admission or exclusion of evidence, he forfeits appellate review unless he can demonstrate plain error. *United States v. Eslinger*, 70 M.J. 193, 197 (C.A.A.F. 2011). Under a plain error analysis, an appellant must demonstrate that "(1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the [appellant]." *United States v. Payne*, 73 M.J. 19, 23 (C.A.A.F. 2014) (quoting *United States v. Tunstall*, 72 M.J. 191, 193–94 (C.A.A.F. 2013)).

We review a military judge's decision to admit evidence for abuse of discretion. *United States v. Jorell*, 73 M.J. 878, 882 (A.F. Ct. Crim. App. 2014) (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)). "A military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law." *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)).

We review the adequacy of a military judge's instructions de novo. *United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006). If an accused fails to make an adequate request for an instruction or object to a proposed instruction, we review for plain error. *Id.* "[M]erely requesting an instruction is ordinarily not sufficient to preserve a claim of error . . . . There must be an objection no later than after the instructions are given and before the court is closed for deliberations, stating that the instructions did not adequately cover the matters raised in the requested instruction." *United States v. Maxwell*, 45 M.J. 406, 426 (C.A.A.F. 1996) (citing R.C.M. 920(f)) (additional citations omitted).

Under Mil. R. Evid. 608(c), evidence of bias, prejudice, or any motive to misrepresent may be admitted, whether through witness testimony or extrinsic evidence. *United States v. Moss*, 63 M.J. 233, 236 (C.A.A.F. 2006). Exposing "a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *United States v. Collier*, 67 M.J. 347, 352 (C.A.A.F. 2009) (quoting *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974)). This right is not unconstrained, and the relevant question is whether a witness' motivation for testifying has been exposed. *Id.* (citing *United States v. Carruthers*, 64 M.J. 340, 344 (C.A.A.F. 2007)).

Mil. R. Evid. 613(b) permits extrinsic evidence of a witness' prior inconsistent statement once the witness is given the opportunity to explain or deny

the statement. The impeachment power of a prior inconsistent statement arises from the conflict between a witness' statements. *United States v. Damatta-Olivera*, 37 M.J. 474, 477 (C.A.A.F. 1993). "There must of course be a real inconsistency between the two assertions of the witness. The purpose is to induce the tribunal to discard the one statement because the witness had also made another statement which cannot at the same time be true." *Id.* at 477–78 (quoting 3A John H. Wigmore, Evidence § 1040 at 1048 (Chadbourne rev. 1970)).

### 3. Analysis

We turn first to Appellant's argument under Mil. R. Evid. 613(b). As a foundational matter, Appellant has failed to demonstrate Col SJ made any statement in the recording inconsistent with his testimony at Appellant's trial. Mil. R. Evid. 613(b) requires two assertions by the same witness that are inconsistent. Col SJ testified about the tone of the meeting as well as his and Appellant's demeanor. By its terms, Mil. R. Evid. 613(b) permits the impeachment of a witness with that witness' prior statement and not simply any evidence that is contrary to the witness' in-court testimony. While the recording may depict a different tone and a different demeanor, such differences hardly amount to statements by Col SJ inconsistent with his in-court testimony.

Other areas of testimony that Appellant argues are available for prior-inconsistent-statement impeachment (e.g., whether Appellant used the word "sir," whether Appellant accused Col SJ of endorsing child pornography, and whether Appellant equivocated when asked if he was recording the meeting) are *Appellant's* out-of-court statements, not Col SJ's. Mil. R. Evid. 613(b) addresses the witness' prior statements, not prior statements of others. The closest Appellant comes to identifying evidence which might fall within the ambit of Mil. R. Evid. 613(b) is Appellant's argument that Col SJ testified he said "this is a little strange" during the meeting and that Col SJ tried to explain that his order to turn off the phone was not illegal, when there is no evidence of either on the recording. Appellant's argument here fails precisely because those statements do not appear in the recording. In other words, nothing said by Col SJ in his prior statement—that is, the recording—is inconsistent with his trial testimony. Without first demonstrating prior inconsistent statements were made by Col SJ, Mil. R. Evid. 613(b) is unavailable to Appellant. The military judge did not abuse his discretion by declining to admit the recording in evidence under Mil. R. Evid. 613(b).

During the discussion of this evidence, the military judge and counsel conflated the question of whether the recording was hearsay or not with the question of its admissibility as extrinsic evidence of a prior inconsistent statement. As the recording was inadmissible under Mil. R. Evid. 613(b), a

hearsay determination was premature. Whether or not the recording amounted to hearsay would have determined whether it could be admitted as substantive evidence, something Appellant avers on appeal he never wanted to do.

Appellant's complaint that he should have been permitted to play only portions of the recording, rather than the entire recording, is being raised for the first time on appeal. At trial, trial defense counsel never indicated a preference to play only excerpts from the recording. Rather, trial defense counsel said they wanted to "use" the recording during cross-examination. When trial defense counsel first disclosed the existence of the recording, the military judge said that trial defense counsel would not be allowed "to play that recording from start to finish," but would be allowed to potentially use "snippets of the audio to demonstrate the inconsistency." Shortly thereafter, trial defense counsel explained they intended to question Col SJ, "and then hit play." Trial defense counsel never indicated they wanted to play only portions of the recording, nor did they object to the military judge's ruling with respect to the quantity of the recording that would be played. Notably, it was the military judge who first raised the prospect of trial defense counsel playing only "snippets" of the recording—a position abandoned in his ultimate ruling in which he said the Defense "is permitted to play the recording in its entirety." We find no evidence in the record of trial supporting Appellant's contention of the military judge "forcing" trial defense counsel to play the entire recording. By the very terms of his ruling, the military judge "permitted" the Defense to play it. To the extent trial defense counsel believed the military judge foreclosed the opportunity to play only portions of the recording, trial defense counsel never objected to such. In fact, trial defense counsel never even mentioned a desire to only play portions of the recording.

Due to the absence of an objection at trial (or even a request), Appellant forfeited this issue, and we will only take corrective action in the event of plain error. On appeal, Appellant has failed to provide either legal support or a cogent argument for finding error on the military judge's part with respect to the length of recording that could be played. Appellant has not explained why he should have been permitted to introduce only selected statements from the larger recording into evidence or how he would have been able to show that Col SJ did not make certain statements during the meeting without playing the whole recording. Even assuming the military judge required trial defense counsel to play the entire recording—which the record of trial proceedings does not support—we would find no error in such a ruling on the facts presented here, much less plain error. Indeed, playing only selected portions of the recording in order to rebut Col SJ's description of the tenor of the meeting would have been misleading and run a substantial risk of confusing the members.

Regarding Appellant's argument the military judge erred when he instructed the members that "the content of the recording has not been verified or authenticated by the Government," trial defense counsel never objected to this portion of the instruction. When the military judge advised the parties of his proposed instruction before the recording was played and asked if either party objected, trial defense counsel said, "[o]ur objection is simply that it does not include the 613 language that we requested. Otherwise, no objection, Your Honor." The parties revisited the instruction prior to the military judge giving the members instructions on findings, and trial defense counsel again focused his objection on "the prior inconsistent testimony language," telling the military judge, "[n]othing further on that one." As a result, any objection to the "verified or authenticated" portion of the instruction has been forfeited, and we review for plain error.

Appellant disclosed the existence and his possession of the recording to trial counsel for the first time mid-trial at the conclusion of Col SJ's direct testimony. Trial defense counsel conceded the recording had not been provided to trial counsel in discovery despite a government discovery request and justified the non-disclosure on tactical grounds. On appeal, Appellant argues the recording need not have been disclosed pretrial because it was "rebuttal evidence"—a position that is at odds with Appellant's use of the recording during the Government's case in chief as well as trial defense counsel's stated tactical reason for not disclosing the recording.[19] Faced with the apparent discovery violation, the military judge had a variety of remedies available, up to and including excluding the recording entirely. R.C.M. 701(g)(3); *United States v. Pomarleau*, 57 M.J. 351, 361–62 (C.A.A.F. 2002). His instruction that the recording "had not been verified or authenticated by the Government" was an accurate statement of fact, and it balanced the Government's inability to examine the evidence with Appellant's interest in playing the recording for the members to counter Col SJ's testimony. The military judge's instruction, given without objection, did not amount to plain error. Our conclusion is bolstered by the military judge's instruction to the members that "the final determination as to the weight or significance of the evidence and the credibility of the witnesses in this case rests solely upon you."

---

[19] We find it difficult to accept the premise that Appellant did not formulate the plan to use the recording at trial prior to Col SJ's direct testimony. Col SJ testified at length about his recollection of the recorded meeting during a preliminary hearing some five months prior to trial, testimony which was reduced to writing and which was submitted to the military judge at an Article 39(a) hearing three weeks before trial on the merits commenced. Col SJ's description of the meeting was squarely a critical issue for trial.

The military judge permitted the recording to be played under Mil. R. Evid. 608(c), which allows evidence of bias, prejudice, or any motive to misrepresent on behalf of the witness. As such, Appellant was free to point to inconsistencies between the recording and Col SJ's testimony and to argue Col SJ's testimony was not credible under the theory he was biased against Appellant or had a motive to provide false testimony against Appellant. The military judge further permitted Appellant to use the recording to contradict Col SJ's testimony regarding Appellant's conduct during the meeting and for "any other relevant impeachment purpose under Mil. R. Evid. 608(c) based on the evidence as perceived by the members." Despite his objections on appeal, Appellant was given a wide berth to impeach Col SJ with the recording, and we perceive no harm to Appellant's case arising from the military judge's rulings and instructions regarding the recording.

We note that had trial defense counsel disclosed the recording prior to trial and sought a preliminary ruling on its admissibility, many of Appellant's concerns surrounding the recording might have been more deliberatively addressed before trial. *See* Analysis of R.C.M. 701, *Manual for Courts-Martial, United States* (2016 ed.), App. 21 at A21–31.

## B. Admission of Records of Appellant's Uncharged Misconduct

In his third assignment of error, Appellant contends the military judge erred by admitting three prosecution exhibits over defense objection. The exhibit consist of: (1) a letter of admonishment Appellant received from Col SJ in March 2016 for sending a disrespectful email to his wing commander; (2) a record of Appellant's nonjudicial punishment imposed by Maj Gen SJ in January 2017 for sending disrespectful emails to Col SJ; and (3) the letter of reprimand Appellant received from Col SJ on 9 August 2017 for sending a disrespectful email to the Air Force Sustainment Center commander's executive officer. Each exhibit includes Appellant's written response.

We provide a more full exposition of the evolution of this issue below, but its basic genesis is rooted in Appellant's attempt to establish a mistake-of-law defense. Appellant's theory was that his statements in the charged offenses were protected communications under the Military Whistleblower Protection Act, and he was therefore immune from prosecution for having made disrespectful comments within those communications.[20] The military judge admit-

---

[20] 10 U.S.C. § 1034. The act, in relevant part, prohibits retaliatory personnel actions against a military member for making or preparing covered communications to a member of Congress, an Inspector General, or person in the member's chain of command. Covered communications include those in which the member complains of vio-

*(Footnote continues on next page)*

ted the three exhibits to rebut Appellant's testimony by demonstrating Appellant was on notice his disrespectful communications were not protected by the Act. After the rebuttal case and the close of the evidence, the military judge determined the Defense had failed to establish a basis for a mistake-of-law defense, and he denied the Defense's request to instruct the members on the defense. On appeal, Appellant argues that his own opinion as to whether his communications were disrespectful was not a matter subject to rebuttal and the exhibits should not have been admitted as such. Alternatively, Appellant argues the military judge's rejection of the mistake-of-law defense rendered Appellant's understanding of the Act irrelevant, and therefore the exhibits were not relevant to his court-martial and should not have been admitted.

### 1. Additional Background

During his direct examination, Appellant testified his 14 August 2017 email about the recording policy contained "some pretty strong language" and that he used such language because he "thought it was a serious issue and that it deserved serious language." He testified he did not intend to be disrespectful in the email, and that he courtesy copied the entire directorate so they knew someone was standing up for what Appellant perceived to be an "infringement on personal rights affect[ing] all of those people." Trial defense counsel then asked Appellant whether he had been educated on the Military Whistleblower Protection Act, to which trial counsel objected.

Trial defense counsel proffered that Appellant was going to testify he believed communications made under the Act could not be used against him in a later adverse action. Trial defense counsel argued Appellant's "mistaken belief" about the Act's operation supported a mistake-of-law defense. Overruling trial counsel's objection, the military judge told the parties that Appellant was permitted to testify what motivated or informed his actions, but whether

---

lations of law or regulations or an abuse of authority. Air Force Instruction 90-301, *Inspector General Complaints Resolution* (27 Aug. 2015), exempts "unlawful communications" from the Act's protections, to include "statements made under circumstances disrespectful to higher authorities." The Supreme Court has held military officials' authority to preserve morale and good order and discipline is paramount to the legislative purposes of 10 U.S.C. § 1034. *Brown v. Glines*, 444 U.S. 348, 360 (1980) (prohibition against circulating petitions without prior approval does not run afoul of the act due to the threat such petitions pose to military discipline). Thus, a military member's invocation of 10 U.S.C. § 1034 does not protect statements that otherwise violate Article 89, UCMJ.

or not that amounted to a legal defense under a mistake-of-law theory "remain[ed] to be seen."

Appellant proceeded to testify that he learned of the Military Whistle-blower Protection Act from a member of his command's Inspector General's Office. Appellant said he understood the Act to protect communications that were "sincerely believed to be true and that alleged a violation of a law or regulation, provided that they were reported—that the communications were made to either an [Inspector General] or someone in the chain of command." Appellant then explained that he relied on this understanding of the law when he sent his 14 August 2017 email.

In general, Appellant characterized himself as being professional and respectful during his interactions with Col SJ, although he admitted being "stern," "direct," and using an elevated voice, "louder than what [Appellant] would call a conversational tone" with Col SJ.

Turning to his Article 138 complaint against Maj Gen SJ, Appellant testified he did not intend to be disrespectful in his complaint or to harass the general—rather, Appellant said his intent to was "to use language of significant severity to get someone's attention to get help, to get relief from the issues [Appellant] was dealing with" and to bring issues to Maj Gen SJ's attention.[21] At the conclusion of his direct examination, Appellant said he was not guilty of any of the charged offenses, and the court recessed for the evening, during which time trial defense counsel sent the military judge a proposed findings instruction on the mistake-of-law defense.

The next morning, prior to cross-examining Appellant, trial counsel sought permission to ask Appellant about his letters of admonishment and

---

[21] Among other things, Appellant wrote to Maj Gen SJ: "I trust that the hardships and embarrassment that fall upon you as a result of these disciplinary measures will bring about sincere remorse and repentance and that I will, in the near future, hear that your character as a civilian is much improved over your character as an officer." In discussing forfeitures Appellant had been required to pay as part of nonjudicial punishment issued by Maj Gen SJ, Appellant told Maj Gen SJ: "when the Directorate was in financial straits and you came and asked me for several thousand dollars, I agreed to give you the money . . . [j]ust to clear up the financials, your personal debts to me have been reimbursed many times over again by concerned citizens wishing to alleviate you from any mental anguish you may be suffering from inability to repay, so let not your heart be troubled on that issue." Regarding Appellant's written response to the nonjudicial punishment, Appellant told Maj Gen SJ: "When you were in legal trouble and having difficulty understanding federal law, I took time out of my personal schedule to educate you and correct your legal deficiencies."

reprimand and his nonjudicial punishment for being disrespectful. Trial counsel argued that Appellant cited the Military Whistleblower Protection Act in his responses to each of those three actions, yet each action was ultimately upheld, which served as evidence that Appellant was aware that the Act did not, in fact, inoculate him from punishment for disrespectful communications. Trial counsel asserted the proposed cross-examination would go to Appellant's credibility, perceptions, and bias, as well as to rebut Appellant's suggestion that he did not understand the impropriety of his conduct. Finally, trial counsel argued Appellant had claimed that he only used "strong language" in the Article 138 complaint and the 14 August 2017 email to emphasize his perception of the severity of the issue at hand, when—in fact—Appellant had records in his personnel file of being admonished, reprimanded, and nonjudicially punished for making similar statements on various other occasions.

The military judge determined Appellant had left the impression with the members that he "mistakenly believed that he had the authority to say anything he wanted in those emails and could not be punished for it . . . including disrespectful language, to a superior commissioned officer," in an effort to mount a mistake-of-law defense. In ruling trial counsel could cross-examine Appellant on the three records, the military judge found they were evidence that Appellant was on notice that disrespectful language was not protected by the Military Whistleblower Protection Act prior to him sending his "recording policy" email and filing his complaint against Maj Gen SJ. The military judge deferred ruling on whether trial counsel could admit the documentary evidence of the records as exhibits in rebuttal until after the Defense's case in chief.

During cross-examination, Appellant testified he believed his 14 August 2017 email was a protected communication under the Military Whistleblower Protection Act. He maintained that he was not on notice that disrespectful language, as charged in this case, fell outside the protections of the Act, in spite of his record of prior failed attempts to invoke the Act's protections. Throughout Appellant's testimony, Appellant maintained his conduct was within the bounds of permissible professional conduct.

After the completion of Appellant's testimony, trial counsel sought to admit the record of nonjudicial punishment and the letters of reprimand and admonishment. The military judge admitted the records, finding they rebutted Appellant's claim he was not on notice that the Military Whistleblower Protection Act did not protect him from punishment for disrespectful conduct. He ruled, "the entirety of the accused's testimony was designed to create the impression that the accused was unaware of certain boundaries and rules re-

garding professional behavior and customs and courtesies, particularly as it related to [Col SJ] and [Maj Gen SJ]," which the three records also rebutted.

In considering Mil. R. Evid. 403, the military judge concluded the probative value of the three exhibits was high, in that they "place[ ] in proper context the previous efforts undertaken by command to correct the accused's behavior and directly rebut[ ] the impression created through his testimony that he was generally unaware that his conduct or words deviated from standards." He concluded the danger of unfair prejudice was low, noting that Appellant assumed the risk of opening the door to uncharged misconduct when he elected to testify. He found the evidence would not confuse the issues or mislead the members, but would assist them by directly rebutting Appellant's testimony. In admitting the exhibits, the military judge directed references to Appellant's attempt to establish a "white heritage month" and his complaints about "anti-white" policies be redacted.

Prior to closing the court for deliberations, the military judge instructed the members:

> You may consider evidence that the accused received an Article 15, a letter of admonishment and a letter of reprimand for engaging in disrespectful conduct for the limited purpose of its tendency, if any, to rebut the contention raised by the accused that his alleged behavior in the offenses charged was the result of ignorance or mistake and to rebut the issue of whether the accused mistakenly believed that his conduct was protected under the Military Whistleblower Protection Act. You may not consider this evidence for any other purpose and you may not conclude from this evidence that the accused is a bad person or has general criminal tendencies and that he therefore committed the offenses charged.

After the close of the evidence, the military judge denied trial defense counsel's request for an instruction on "ignorance or mistake of law" for Specifications 3 and 4 of Charge I regarding Appellant's alleged reliance on the Military Whistleblower Protection Act. Focusing on the discussion to R.C.M. 916(l), the military judge explained ignorance or mistake of law "may be a defense when the mistake results from the reliance on the decision or pronouncement of an authorized public official or agency." Although Appellant had been told about the Act by a member of the Inspector General's Office, the military judge found Appellant had not been advised that otherwise criminal conduct was immune from command action simply because the conduct fell within a complaint. Reasoning that the Appellant did not rely on a decision or pronouncement of a public official or agency, but rather that he simply

concluded on his own the Act provided blanket protection for his conduct, the military judge found the defense of mistake of law inapplicable.

### 2. Law

As noted above, a military judge's ruling to admit or exclude evidence will not be disturbed except for a clear abuse of discretion. Military judges are afforded wide latitude in controlling the presentation of rebuttal evidence. *United States v. Gittens*, 36 M.J. 594, 598 (A.F.C.M.R. 1992). Otherwise inadmissible evidence may be admitted as rebuttal evidence when the opposing party presents potentially misleading testimony, and thereby opens the door to evidence that corrects the record. *See, e.g., United States v. McIntosh*, No. ACM 37977, 2014 CCA LEXIS 29, at *20 (A.F. Ct. Crim. App. 17 Jan. 2014) (unpub. op.).

The purpose of rebuttal evidence is "to explain, repel, counteract or disprove the evidence introduced by the opposing party." *United States v. Wirth*, 18 M.J. 214, 218 (C.M.A. 1984) (quoting *United States v. Shaw*, 26 C.M.R. 47, 51 (C.M.A. 1958) (Ferguson, J., dissenting)). The scope of rebuttal evidence is defined by evidence introduced by the other party. *United States v. Banks*, 36 M.J. 150, 166 (C.M.A. 1992); *United States v. Hallum*, 31 M.J. 254, 255–56 (C.M.A. 1990).

When an accused chooses to testify under oath, he assumes certain risks, to include having the truthfulness of his answers tested on cross-examination or countered by evidence in rebuttal as well as being impeached by contradiction. *See, e.g., United States v. Swift*, 53 M.J. 439, 450 (C.A.A.F. 2000); *United States v. Penrose*, 48 C.M.R. 173, 175 (A.F.C.M.R. 1974). A testifying accused is "subject to impeachment just like any other witness." *United States v. Stroh*, 46 M.J. 643, 648 (A.F. Ct. Crim. App. 1997). In impeaching an accused who has elected to testify, the Government typically may not use extrinsic evidence, unless such evidence shows bias, prejudice, or a motive to misrepresent, or when trial counsel seeks to impeach the accused by contradiction. *Id.* Impeachment by contradiction through admission of extrinsic evidence is permissible when an accused denies committing certain misconduct or volunteers a broad denial in response to a narrow cross-examination question. *Id.* The purpose of impeachment by contradiction is to demonstrate "the contrary of a witness' asserted fact, so as to raise an inference of a general defective trustworthiness." *United States v. Banker*, 15 M.J. 207, 210 (C.M.A. 1983).

Ordinarily, impeachment by contradiction is an appropriate tool to contradict a witness' testimony only on non-collateral matters. *United States v. Langhorne*, 77 M.J. 547, 556 (A.F. Ct. Crim. App. 2017) (citing *Banker*, 15 M.J. at 211). Collateral matters, however, may be impeached by contradiction via extrinsic evidence when the collateral matter is raised during direct ex-

amination. *Id.* "Evidence of a witness's bias, prejudice, or motive to misrepresent is never collateral and may be proven by extrinsic evidence." *Id.*

### 3. Analysis

Appellant, not the Government, first raised the Military Whistleblower Protection Act during his direct examination in an attempt to establish a mistake-of-law defense. Indeed, Appellant introduced this evidence over trial counsel's objection. During the discussion regarding the objection, the military judge specifically highlighted that trial counsel would be able to rebut Appellant's testimony about the law through cross-examination "or even witness testimony." Appellant then proceeded to portray himself as being unaware of the fact he could be punished for making disrespectful statements in documents he styled as complaints under the Military Whistleblower Protection Act. By doing so, Appellant invited the Government to test the accuracy of this portrayal.

Even after being confronted with three prior instances in which Appellant was counseled for disrespectful statements in which he tried to invoke the Act, Appellant maintained he was not aware disrespectful language was unprotected by the Act. In adhering to this position during cross-examination, Appellant paved the way for the Government to rebut his testimony by offering extrinsic evidence that counteracted the evidence Appellant himself offered.

The exhibits admitted against Appellant were unquestionably prejudicial in that they directly undercut his attempt to raise a mistake-of-law defense. After Appellant's three previous failed attempts to invoke the Military Whistleblower Protection Act to shield him from the consequences of making disrespectful statements, there is little room to argue he believed he could engage in more of the same conduct with impunity. The exhibits' admission was not, however, *unfairly* prejudicial in the face of Appellant's persistent denials of any impropriety on his part. Had Appellant acknowledged the prior corrective actions put him on notice his conduct was not protected by the Military Whistleblower Protection Act, the need for the Government to admit the records themselves would have been attenuated. Appellant's testimony, however, only served to heighten the significance of what Appellant knew or should have known about the Act. In addition to rebutting Appellant's claimed reliance on the Act, the exhibits rebutted Appellant's contention that his conduct was not disrespectful or that he mistakenly believed he was not being disrespectful.

It was Appellant who first introduced evidence of the Act, and the Government was not required to allow that evidence to go unrebutted in the hopes the military judge would later rule the mistake-of-law defense inappli-

cable to Appellant's case. The fact the military judge later determined Appellant had failed to reasonably raise a mistake-of-law defense did not serve to retroactively strip the Government of its ability to challenge Appellant's testimony.

The military judge instructed the members that the three exhibits could only be used to rebut Appellant's contentions that he was operating under ignorance or mistake or that he mistakenly believed the Military Whistleblower Protection Act protected his behavior. We presume members follow instructions given by military judges absent evidence to the contrary. *United States v. Thompson*, 63 M.J. 228, 232 (C.A.A.F. 2006). By so instructing the members, the military judge insulated Appellant from the risk the members would use this evidence for an improper purpose. The military judge did not abuse his discretion in admitting the three exhibits.

## C. Multiplicity

### 1. Additional Background

Appellant argues Specification 3 of Charge I should be dismissed, as it is a lesser included offense of the Specification of Charge III, and is therefore multiplicious. The Specification of Charge III alleges Appellant violated Article 133, UCMJ, by engaging in conduct unbecoming an officer and a gentleman, while Specification 3 of Charge I alleges he violated Article 89, UCMJ, by behaving with disrespect toward his superior commissioned officer.

Both offenses arise from the same course of conduct: Appellant's 14 August 2017 "recording policy" email. The Article 133 violation consists of Appellant using "insulting and defamatory language about [Col SJ] to other military personnel." In response to a trial defense request for a bill of particulars, the Government indicated the "insulting and defamatory language" charged in the Article 133 specification is that which is in the 14 August 2017 email. The Article 89 violation alleges Appellant behaved with disrespect toward Col SJ by writing an email and then sending that email "to numerous other members of the Air Force Nuclear Weapons Center." The Article 89 specification identifies two specific passages in the email,[22] while the Article 133 specification does not identify any particular language from the email.

---

[22] The passages set out in the specification are: (1) that Col SJ "published the recording policy in question, under false pretense of military necessity, as a means of concealing his incompetence and evading accountability for any future misconduct he may wish to perpetrate against me (and perhaps others)," and (2) "[n]ot only are these regulations not relevant to an information-security policy, they are not even

*(Footnote continues on next page)*

At trial, Appellant moved the military judge to dismiss the Article 89 specification, alleging it was multiplicious with the Article 133 specification and amounted to an unreasonable multiplication of charges. The Government explained that the Article 89 offense was meant to capture Appellant's disrespectful conduct towards Col SJ by sending the email to him, while the Article 133 offense was meant to capture Appellant's act of disseminating that language to the military members of the directorate.[23]

The military judge ruled these two offenses were not multiplicious or an unreasonable multiplication of charges for findings, but they did amount to an unreasonable multiplication of charges for sentencing insofar as the specifications "focus on essentially the same criminal act." As a corrective measure, the military judge merged the two specifications for sentencing purposes.

**2. Law**

We review claims of multiplicity de novo. *United States v. Paxton*, 64 M.J. 484, 490 (C.A.A.F. 2007). "Multiplicity, a constitutional violation under the Double Jeopardy Clause, occurs if a court, 'contrary to the intent of Congress, imposes multiple convictions and punishments under different statutes for the same act or course of conduct.'" *Id.* (citing *United States v. Teters*, 37 M.J. 370, 373 (C.M.A. 1993)). We employ the separate elements test set out in *Blockburger v. United States*, 284 U.S. 299 (1932) to determine congressional intent regarding whether multiple convictions may be had for a single act or course of conduct. *United States v. Roderick*, 62 M.J. 425, 432 (C.A.A.F. 2006). Under this test, specifications are not multiplicious as long as each offense "requires proof of an element or fact which the other does not." *United States v. Dillon*, 61 M.J. 221, 223 (C.A.A.F. 2005) (citing *Brown v. Ohio*, 432 U.S. 161, 168, (1977)). The analysis focuses on "the elements of the statutes violated and not to the pleadings or proof of these offenses." *United States v.*

relevant to [Col SJ] himself because he is not a commander in any sense of the word. He holds a mere staff billet."

[23] Prior to trial, the staff judge advocate sent trial defense counsel an email further explaining this point, writing: "The [Article] 89 and [Article] 133 specifications are legally distinct even though they arise from the same action of sending an email. The violation of [Article] 89 is based on [Appellant] being disrespectful toward Col [SJ] for sending an email directly to him criticizing his policies and undermining his ability to command a unit. In this specification, Col [SJ] is a victim and the criminal act is how [Appellant] spoke (via email) to him. The violation of [Article] 133 is not based on disrespect directly toward Col [SJ], but rather on using insulting language about a superior commissioned officer to other military members (who received the email) which is explicitly prohibited under [Article] 133."

*Coleman*, __ M.J. __, No. 19-0087, 2019 CAAF LEXIS 504, at *4 (C.A.A.F. 10 Jul. 2019) (quoting *Teters*, 37 M.J. at 377). As a result, "a strict facial comparison of the elements of the charged offenses" is called for. *Id.* Charging both a greater offense and a lesser included offense would ordinarily fail this test, as a lesser included offense—by definition—includes every element of the greater offense. *See, e.g., United States v. Jones*, 68 M.J. 465, 470–71 (C.A.A.F. 2010).

We employ a three-step analysis to assess whether charges are multiplicious: (1) we determine whether the charges are based on separate acts; (2) if not, we determine whether Congress has manifested "an overt expression of legislative intent" regarding whether the two charges are multiplicious; and (3) if there is no overt expression, whether we can infer Congress's intent by determining whether each charge requires proof of an element the other does not. *Coleman*, __ M.J. at __, 2019 CAAF LEXIS 504 at *4–5 (quoting *Teters*, 37 M.J. at 376). If each charge requires a unique element of proof, we infer that Congress intended to permit an accused to be charged and punished under each charge, even when the charges criminalize the same overt act. *Id.*

### 3. Analysis

As charged in this case, the elements of the Article 89, UCMJ, violation are: (1) Appellant wrote and sent an email to members of the Air Force Nuclear Weapons Center concerning a particular officer (Col SJ); (2) the behavior was directed toward that officer; (3) that officer was Appellant's superior commissioned officer; (4) Appellant knew that officer was his superior commissioned officer; and (5) that, under the circumstances, Appellant's behavior was disrespectful to that commissioned officer.[24] The elements of the Article 133, UCMJ, violation are: (1) Appellant used insulting and defamatory language about Col SJ to other military personnel; and (2) under the circumstances, this act constituted conduct unbecoming an officer.[25]

There are only minor differences between the Article 89 and Article 133 specifications. Under the former, Appellant was charged with behaving with disrespect towards Col SJ by writing certain language in an email and then sending that email to "numerous other members" of the Air Force Nuclear Weapons Center. Under the latter, Appellant was charged with using "insulting and defamatory language" (in the same email) about Col SJ to other military personnel. In other words, the specifications are different in that the Ar-

---

[24] *Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶ 13(b).

[25] *Id.*, pt. IV, ¶ 59(b).

ticle 89 specification only addresses two passages in the email; the Article 133 specification limits the audience to just military personnel; and the Article 133 specification pertains to "insulting and defamatory language" in the email. Indisputably, Appellant's underlying conduct was the same—he wrote and sent a disrespectful email about Col SJ to the members of his directorate.

In determining whether these two specifications are multiplicious, we use the three-part inquiry set out in *Coleman* and easily dispense with the first two parts: the specifications were based upon a single act by Appellant, and there is no overt expression of legislative intent regarding whether the specifications should be viewed as multiplicious. Thus, our resolution of this issue turns upon the third part—that is, whether each offense requires proof of an element the other does not. We conclude the specifications are not multiplicious in that the Article 133 specification requires proof of conduct unbecoming an officer and a gentleman, which the Article 89 specification does not. The Article 89 specification requires proof that Col SJ was Appellant's superior commissioned officer and known by Appellant to be so—elements not required by the Article 133 offense. This straightforward application of the *Blockburger* elements test leads us to determine that the offenses charged here are not multiplicious.

### D. The Alleged Attempted Seizure of Appellant's Phone

Appellant argues that Col SJ's order to leave his phone outside the office when Appellant was receiving a letter of reprimand on 9 August 2017 was "tantamount to an illegal seizure order" which Appellant had no duty to obey. Appellant challenged this order at trial, but the military judge concluded the order to leave his phone outside Col SJ's office was lawful. In his ruling, the military judge explained Col SJ "was justified in refusing to allow a subordinate with a lengthy history of disrespectful conduct to surreptitiously or even openly record what was an official counseling session involving the service of [a letter of reprimand], which by definition related directly to the maintenance of good order and discipline."

Contrary to Appellant's suggestion, Col SJ did not attempt to seize Appellant's phone at the outset of the 9 August 2017 meeting. Rather, Col SJ told Appellant to leave his phone outside the office so that Appellant would not record the meeting. Col SJ's order was lawful and Appellant refused to follow it. We have reviewed the military judge's findings of fact and conclusions of law on this point and find no reason to disturb them on appeal.

### III. Conclusion

The findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles

59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court